In re Kevin J. FRIES and Diane L. Fries, Debtors.

Bankruptcy No. 86-01193G.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 29, 1986.

Thomas Turner and James J. Gannon, Philadelphia, Pa., for debtors.

Jonathan P. Andrews, Jon C. Sirlin and Associates, Philadelphia, Pa., for objector, Philadelphia Nat. Bank.

James J. O'Connell, Philadelphia, Pa., Trustee.

## OPINION

BRUCE FOX, Bankruptcy Judge:

The debtors, Kevin J. Fries and Diane L. Fries, filed this chapter 13 bankruptcy case on March 12, 1986. On October 21, 1986, the court held a confirmation hearing. Prior to the confirmation hearing, Philadelphia National Bank (PNB), which holds both secured and unsecured claims, filed objections to confirmation on three grounds. PNB asserts that: (1) the debtors have not shown cause for extending the plan to 60 months as required by 11 U.S.C. § 1322(c); (2) the plan does not provide for full payment of PNB's allowed secured claim; and (3) the plan fails to satisfy the "disposable income test" under 11 U.S.C. § 1325(b)(1)(B).

At the confirmation hearing, debtors' counsel represented that amendments to the income and expense disclosures of their chapter 13 statement and an amended chapter 13 plan had been or would be filed imminently. After counsel disclosed the substance of the amendments, the parties agreed to proceed with the confirmation hearing. Neither side called any witnesses. Instead, the parties agreed that the court could rule upon the objections based solely upon the papers filed of record in the bankruptcy case.[1] On October 22, 1986, the debtors filed the amendments to their chapter 13 statement and an amended chapter 13 plan.

For the reasons set forth below, PNB's first and second objections to the debtors' chapter 13 plan[2] will be denied. However, because the record is insufficient for a fair determination of the objection under section 1325(b)(1)(B), I will exercise my discretion to schedule a hearing so that the parties can supplement the current record.

### I.

In order to understand the issues in the case, it is helpful to begin with a description the debtors' chapter 13 plan.

The plan provides for submission to the trustee of $383.89 for the first 2 months of the plan followed by submission of $1,470.00 per month for the final 58 months of the plan. The plan payments total $86,027.78. While the plan does not expressly make this distinction, it is clearly the debtors' intent to cure the prepetition delinquencies on two secured claims (the claims held by PNB and Horizon Financial) and to pay, in its entirety, a third secured claim (held by Meridian Bank). *Compare* 11 U.S.C. § 1322(b)(5) *with id.* § 1325(a)(5). In connection with the cure of the two secured claims, the plan expressly provides that, commencing in the third month of the plan, the trustee shall send to PNB and Horizon Financial the regular postpetition mortgage payments falling due each month. The plan also provides for payment of all administrative expenses (including an attorney's fee of $750.00), a trustee's commission of 3.2% and a distribution to unsecured creditors of not less than 10%.[3]

---

1. The amended plan increased slightly the total amount to be paid under the plan and decreased slightly the proposed compensation to the chapter 13 trustee. Because this modification of the proposed compensation to the trustee was not brought to the trustee's attention at the October 21, 1986 hearing, I issued an order on November 7, 1986 granting the trustee 10 days in which to advise the court of his position regarding confirmation. The trustee has since advised the court that he has no objection to the proposed reduction of his commission in this case.

2. From this point, references to "the plan" will mean the amended plan filed on October 22, 1986.

3. Below is a summary of the distribution to be made by the trustee under the plan:

Perhaps a more conventional way of describing this plan is that it proposes to maintain the post-petition mortgage payments of $1,000.00 per month falling due on the two residential mortgages and to pay $28,028.00 (or, an average of $467.00 per month) to creditors and administrative expenses over five years. *See generally In re Foster,* 670 F.2d 478, 488–90 (5th Cir.1980) (discussing plans providing for maintenance of current mortgage payments with debtor acting as own disbursal agent); *In re Evans,* 66 B.R. 506, 509 (Bankr.E.D.Pa.1986).

In the debtors' initial chapter 13 statement, they disclosed net monthly income of $2,600.00 derived from Mr. Fries' employment. Mrs. Fries listed her occupation as a "student" due to graduate in May 1986. The debtors listed monthly living expenses totalling $1,164.00 for themselves and their three children ages 9, 6 and 3, not counting the $1,000.00 falling due on the PNB and Horizon mortgages. In their initial plan, the debtors proposed to pay $1,428.00 monthly to the trustee, anticipating that $1,436.00 would be available from their income after deducting their living expenses.

The amended chapter 13 statement notes a number of significant changes which have occurred since the petition was filed. Mrs. Fries is now working with an estimated net monthly income of $1,200.00 and Mr. Fries' monthly income has increased $500.00. Thus, the debtors' net monthly income increased to $4,300.00. However, the debtors have also noted significant increases in their monthly living expenses. The amended chapter 13 statement lists their monthly expenses now as $2,780.00, not counting the $1,000.00 falling due on the PNB and Horizon mortgages. Debtors propose to pay $1,427.84 to the trustee monthly of the $1,520.00 left after their estimated monthly expenses.

| | |
|---|---:|
| Counsel's fee | $ 750.00 |
| Trustee's commission (3.2%) | 2,753.00 |
| Postpetition payments due to PNB and Horizon | 58,000.00 |
| PNB prepetition arrears | 3,999.00 |
| Horizon prepetition arrears | 1,779.00 |

## II.

PNB contends that the debtors have not shown cause, pursuant to 11 U.S.C. § 1322(c), so as to allow the period of plan payments to extend to 60 months. Section 1322(c) provides:

The plan may not provide for payments over a period that is longer than three years, unless the court, for cause approves a longer period, but the court may not approve a period that is longer than five years.

Section 1322(c) had no counterpart under chapter XIII of the former Bankruptcy Act. The legislative history explains why Congress limited the length of chapter 13 plan to five years and only for cause.

[Under chapter XIII of the Act], in certain areas of the country, inadequate supervision of debtors attempting to perform under wage earner plans have made them a way of life for certain debtors. Extensions on plans, new cases and newly incurred debts put some debtors under court supervised repayment plans for seven to ten years. This has become the closest thing there is to indentured servitude; it lasts for an identifiable [sic] period and does not provide the relief and fresh start for the debtor that is the essence of modern bankruptcy law.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 117 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6078 (footnote omitted).

The Code contains no definition of the "cause" necessary for the extension of a plan to five years. Collier suggests that a debtor's inability to cure a default under section 1322(b)(5) or to pay priority or allowed secured claims in a shorter time should be grounds for approving plans longer than three years. 5 Collier on Bankruptcy ¶ 1322.15 (15th ed. 1986) ("Collier").

In a number of cases, where the proposed plan payments appeared to consti-

| | |
|---|---:|
| Meridian (In full) | $13,925.00 |
| Unsecured claims (19.2%) distribution | 4,822.00 |
| | $86,028.00 |

tute the debtor's best effort, debtors have been permitted to extend the plan term beyond 36 months based on rationales akin to those enunciated in Collier. *See In re Purdy,* 16 B.R. 847 (N.D.Ga.1981), *aff'g,* 10 B.R. 902 (Bankr.N.D.Ga.1981); *In re Powell,* 15 B.R. 465 (Bankr.N.D.Ga.1981); *In re Eury,* 11 B.R. 397 (Bankr.N.D.Ga.1981). When courts have focused on the debtors' ability to pay, the underlying concern appears to be to prevent the debtor from "stretching out" to five years payments that could be made in three years. *Cf. Matter of Minor,* 16 B.R. 147, 148 (Bankr. S.D.Ohio 1981) (under plan proposing 100% payment to unsecured debt, burden on debtor to show "why the debt should not be paid out in three years").

In a slightly different context, some courts have rejected creditor demands that a court *require* a debtor to extend the plan to 5 years in order to increase the dividend to unsecured creditors.

A more substantial payment to unsecured creditors ... does not qualify as "cause" for a Chapter 13 plan to extend more than three years. Every three-year plan providing less than full repayment to unsecured creditors can be extended to provide more substantial payment to them. If such payment were to qualify as "cause," the chapter 13 trustee could routinely object to all such plans, and the three-year Chapter 13 plan would become the exception, rather than the rule. This is surely not a legitimate interpretation of section 1322(c)....

*In re Greer,* 60 B.R. 547, 555 (Bankr.C.D. Cal.1986). *See also In re Moss,* 5 B.R. 123 (Bankr.M.D.Tenn.1980). *But see In re Fulghum,* 22 B.R. 526 (Bankr.E.D.Ark. 1982).

At the other extreme, a few courts have refused to permit an extension of the plan period to 5 years unless the extension will result in a substantial dividend to creditors. *See In re Price,* 20 B.R. 253 (Bankr.W.D. Ky.1981); *In re Poff,* 7 B.R. 15 (Bankr.S.D.

Ohio 1980). These decisions are highly questionable "in light of the rejection by nine federal courts of appeals of a substantial repayment requirement for chapter 13 plans," *In re Goodavage,* 41 B.R. 742 (Bankr.E.D.Va.1984); *In re Hines,* 723 F.2d 333 (3d Cir.1983), as well as the recent enactment of 11 U.S.C. § 1325(b)(1)(B). "If the Chapter 13 Trustee or a creditor contends that a debtor is not proposing a sufficient payment to unsecured creditors, such objector should examine carefully the income and expense projections of a debtor to assure that the debtor meets the best efforts requirement of section 1325(b)." *In re Greer,* 60 B.R. at 555.

▪ After reviewing the caselaw, I conclude that the analysis of the "cause" requirement set forth in Collier's is most consistent with the policies which led Congress to enact section 1322(c). The purpose of that section is to protect debtors from involuntary participation in chapter 13. Confirmation issues relating to creditor dissatisfaction with the amount of the dividend on unsecured claims or doubts about the plan's feasibility [4] involve determinations which are better made under other Code provisions, such as sections 1325(a)(5) and 1325(b)(1)(B). *See in re Powell,* 15 B.R. at 473 n. 18; *cf. In re Gathright,* 67 B.R. 384, 389–90 (Bankr.E.D. Pa.1986) (involving construction of good faith requirement under section 1325(a)(3)), *appeal docketed* (E.D.Pa. December 3, 1986).

▪ In this case, payment of the priority claims, the secured claims and the mortgage delinquencies will, according to my calculations, consume approximately 49 months of the proposed plan. The debtors have, on their own, proposed to continue making plan payment for approximately an additional 11 months. By doing so, they will produce a dividend of almost 20% for the unsecured creditors. In its capacity as the holder of an unsecured claim, PNB would receive no dividend if the debtors are

**4.** *See In re Goodavage,* 41 B.R. 742 (Bankr.E.D. Va.1984); *In re Hockaday,* 3 B.R. 254 (Bankr.S. D.Cal.1980).

not permitted to extend their plan beyond 36 months. "It is difficult to understand why the Bank seeks this result." *In re Powell*, 15 B.R. at 473 n. 18.

For these reasons, I am satisfied that the debtors have established cause for the extension of their plan to 60 months.

### III.

PNB's second objection is that the plan does not provide for full payment of its allowed secured claim. The debtors' intent under their plan is to cure their prepetition delinquency on the mortgage held by PNB. I therefore understand PNB's objection to be an assertion that, as the holder of a secured claim, it is entitled to the value, as of the effective date of the plan, of the arrearages to be paid through the plan. *See* 11 U.S.C. § 1325(a)(5)(B)(ii).

The issue presented, colloquially known among bankruptcy practitioners as the "interest on arrears" issue, is hotly contested in bankruptcy courts in various jurisdictions. Resolution of the issue requires a determination of the interplay between two Code provisions, sections 1322(b) and 1325(a)(5)(B).

The two circuit courts most often cited on the issue have reached contrary results. *Compare In re Terry*, 780 F.2d 894 (11th Cir.1986) (holding that section 1322(b) was intended to be an exception to section 1325(a)(5)(B) and that allowing interest arrears would be an improper modification of the mortgage contract) *with In re Colegrove*, 771 F.2d 119 (6th Cir.1985) (2–1 decision) (holding that interest is required by section 1325(a)(5)). A slightly different rationale for the denial of interest on arrears was offered by the dissenting opinion in *Colegrove*. The dissent concluded that the operative bankruptcy provision is section 1322(b)(5) which provides that, notwithstanding the prohibition against modification of a secured creditor's rights found in section 1322(b)(2), a chapter 13 plan may cure a default within a reasonable time. The dissent reasoned that under section 1322(b)(5), it is the contract between the parties that determines what constitutes

curing a default. "If the parties intended to allow interest on arrearage, a provision to this effect must be included in the contract." 771 F.2d at 123.

In this district, in a number of opinions, Chief Judge Goldhaber has held that payment of interest on arrears is mandated by section 1325(a)(5). *In re McCall*, 57 B.R. 642 (Bankr.E.D.Pa.1986); *In re Einspahr*, 30 B.R. 356 (Bankr.E.D.Pa.1983); *In re Evans*, 20 B.R. 175 (Bankr.E.D.Pa.1982). A more recent decision on the issue is presently on appeal to the district court. *In re Nesmith*, 57 B.R. 348 (Bankr.E.D.Pa.1986), *appeal docketed*, No. 86–1553 (E.D.Pa.). Most recently, Judge Scholl has held, in a case that is also now on appeal, that a residential mortgage lender in Pennsylvania is not entitled to interest on arrears in a chapter 13 bankruptcy proceeding. *In re Small*, 65 B.R. 686 (Bankr.E.D.Pa.1986), *appeal docketed*, (E.D.Pa. October 15, 1986). Unlike the *Terry* court and the dissenting judge in *Colegrove*, Judge Scholl grounded his decision on state law principles, *i.e.*, Pennsylvania Act 6 of 1974, 41 P.S. §§ 404, 406.

In view of the number of opinions which air the various analyses of this issue, I will not offer a lengthy discussion here. I do agree with the reasoning of the dissent in *Colegrove*. In my view, the right to cure a default and the payment of a delinquency on a claim secured by the debtor's residence "cannot be deemed analogous to a secured or unsecured claim; Congress has placed such claims in their own sui generis category." *Colegrove*, 771 F.2d at 125 (dissenting opinion). In other words, the arrearage is not a "claim" within the meaning of 11 U.S.C. § 1325(a)(5). The unpaid balance owing is the "claim," but Congress, by virtue of section 1322(b)(5), granted debtors the option of providing only for the arrears rather than the total unpaid balance owing. Under section 1322(b)(5), the determination of what constitutes a cure is necessarily determined by the contract between the parties and appli-

cable state law.[5] *Accord,* 5 Collier ¶ 1322.-09[4].

▪ In this case, PNB's rights are governed by section 1322(b)(5) and applicable nonbankruptcy law. Since the underlying mortgage agreement does not provide for interest on arrears, PNB's objection to confirmation is without merit.

## IV.

PNB's final objection, made in its capacity as the holder of an unsecured claim, is that the plan does not comply with 11 U.S.C. § 1325(b)(1)(B). Section 1325(b)(1), which was added to the Code by the 1984 amendments, provides:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> > (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> >
> > (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

As a relatively new provision of the Code, there is not an abundance of decisional authority interpreting section 1325(b)(1)(B). According to Collier, this section represents Congress' resolution of the pre–1984 dispute regarding whether there should be a minimum level of payment in chapter 13 beyond that set by the section 1325(a)(4) "best interest of creditors" test. 5 Collier ¶ 1325.08[1]. When

an objection to confirmation is filed under section 1325(b)(1) and the plan does not provide for full payment of allowed secured claims under section 1325(b)(1)(A), the court must determine whether the debtor is submitting all of his projected disposable income for the three year period beginning with the first plan payment.

Under section 1325(b)(1)(B), the court's determination is a two step process. First, the court must project the debtor's total income over the applicable three year period. Second, the court must determine the debtor's "disposable income." Disposable income is defined as income

> not reasonably necessary to be expended—
>
> > (A) for the maintenance or support of the debtor or a dependent of a debtor; or
> >
> > (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2).

The case at bar is in a peculiar posture resulting from the manner in which counsel chose to present it. At the section 341 hearing in this case, PNB learned that the debtors' income had increased since the filing of their petition due to Mrs. Fries' employment. This information apparently led PNB to file its objection to confirmation based on section 1325(b)(1)(B). At the confirmation hearing, PNB was presented, for the first time, with an amended income and expense statement. Despite the disadvantageous position in which it was placed by the debtors' filing on the day of the hearing, PNB did not ask for a continuance. PNB elected to proceed and submit the case "on the papers." [6]

---

**5.** Thus, while I reach the same result, I do not fully agree with the reasoning in *In re Small* in two respects. First, I conclude that it is bankruptcy law which resolves the issue; *i.e.,* section 1322(b) of the Code requires the application of state law. Second, I find it unnecessary to determine whether 41 P.S. § 404 either requires payment of interest on arrears in order to effect a cure or, conversely, prohibits such provisions in residential mortgage agreements. The mortgage in this case does not contain a provision under which PNB would be entitled to interest on arrears.

**6.** In agreeing to submit their objections "on the papers," PNB made clear that it was not stipulating to the truth of the facts set forth in the amendments to the income and expense statement.

PNB's section 1325(b)(1)(B) objection seems to be premised on the assumption that, upon reviewing the debtors' income and expense statement, I will find the debtors' claimed expenses unreasonably high. I observe at the outset that the scope of my review of the debtors' living expenses is narrow.

> [T]he court cannot and should not order debtors to alter their lifestyles where there is no obvious indulgence in luxuries, even where one or more unsecured creditors demand such a change. To engage in such close judgments and supervision would be to contravene the intent of Congress. It would also place impossible burdens on the court in determining the absolute necessity of every expense in each debtor's budget.

5 Collier ¶ 13325.08[4][b], at 1325–49; *accord,* Breitowitz, *New Developments in Consumer Bankruptcies: Chapter 7 Dismissal on the Basis of "Substantial Abuse"* (First Installment), 59 Am.Bank.J. 327, 351–54 (1985). *See also* S.Rep. No. 98–65, 98th Cong., 1st Sess. 22 (1983) (referring to use of Labor Department cost of living figures as norms for reasonably necessary expenses for support of the debtor and his family). *But see In re Kitson,* 65 B.R. 615 (Bankr.E.D.N.C.1986).

■ I have closely reviewed the two income and expenses statements that debtors have submitted in this case. Most of the expenses set forth are within reason [7] for a family consisting of two adults and three children under the age of ten years. I note also that the debtors are proposing to submit a significant sum each month, approximately $467.00 exclusive of ongoing mortgage payments, toward the claims provided for in their plan. On the other hand, there are aspects of the debtors' income and expense statements that raise legitimate questions under section 1325(b)(1)(B).[8] The debtors may be able to respond to these issues and establish that all of their disposable income is being submitted to the trustee. However, neither party has delved into these questions or offered any testimony.

Thus, while my facial review of the income and expense statements causes me some concern, the flimsy record provides an imperfect means to analyze the issues. It would be fair to say that neither side has convinced me on the merits of their respective positions. Consequently, I must analyze the issue of burden of proof in order to decide this case.

Initially, it is necessary to distinguish between the two meanings given to the term burden of proof. The first meaning refers to the risk of nonpersuasion, *i.e.,* which party has the burden of persuading the trier of fact that a particular fact is true. The second meaning refers to the burden of producing sufficient evidence from which the factfinder can reasonably infer the existence of the fact to be proved. McCormick on Evidence §§ 336–37 (2d ed.

---

**7.** Debtors' income and expense statement discloses a monthly "contingency fund" of $92.16, representing monies left over after payment of the debtors' living expenses and their monthly payment to the chapter 13 trustee. A reasonable reserve fund in a debtor's budget is not violative of section 1325(b)(1)(B). I agree with one court that stated:

> A cushion of money is necessary in chapter 13 to guard against life's expectencies. It is not in the public interest to squeeze the last dollar from Chapter 13 debtors to fund a Chapter 13 plan.

*In re Otero,* 48 B.R. 704, 708 (Bankr.E.D.Va. 1985); *accord, In re Greer,* 60 B.R. 547 (Bankr. C.D.Cal.1986). *See generally In re Roe,* 16 B.R. 706 (Bankr.D.Kan.1982) (in case prior to 1984 amendments, court allows budget cushion in context of determination whether plan was pro-

posed in good faith.) In this case, I find the cushion provided in the debtors' estimated budget to be reasonable.

**8.** For example, the amended income and expense statement indicates, for the first time, that the debtors pay $235.00 per month for "life/property liability insurance." How much of the premium represents property liability insurance and is that portion included in the escrow component of debtors' regular monthly mortgage payment? Why were medical and dental insurance costs included in the amended statement but not the first? Explanations would also be helpful concerning increases in debtors' expenses for utilities and food budget between the two disclosures as well as the details of the "unreimbursed business expense" reported by the debtors.

1972) ("McCormick"); IX Wigmore on Evidence §§ 2485–87 (rev.ed. 1981); *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3d Cir.1978). "Only after the initial burden of producing evidence (and it may shift to the other party) has been met, does the burden of ultimate persuasion arise." *DeMarines*, 580 F.2d at 1200. There is no single principle for courts to follow in allocating these burdens.

> Their allocation ... will depend upon the weight that is given to any one or more of several factors, including: (1) the natural tendency to place the burdens on the party desiring change, (2) special policy considerations such as those disfavoring certain defenses, (3) convenience, (4) fairness, and (5) the judicial estimate of probabilities.

McCormick § 337, at 788–89 (footnote omitted); *accord*, IX Wigmore § 2486; *DeMarines*, 580 F.2d at 1200. *See also In re Mendenhall*, 54 B.R. 44, 46 (Bankr.W.D. Ark.1985). The burdens may also be allocated by the legislature. *See Alabama By-Products Corp. v. Killingsworth*, 733 F.2d 1511 (11th Cir.1984).

It is not altogether clear how the burdens are to be allocated in chapter 13 confirmation hearings. Reference to Bankr. Rule 3020(b) suggests that it may be the debtor who has the burden of persuasion on confirmation issues under section 1325.

> The court shall rule on confirmation of the plan after notice and hearing as provided in Rule 2002. If no objection is timely filed, the court may find, without receiving evidence, that the plan has been proposed in good faith and not by any means forbidden by law.

The reference to the good faith requirement for plan confirmation in Rule 3020 (found, in chapter 13 cases, in section 1325(a)(3)) by implication suggests that the debtor has the burden of production with respect to other confirmation requirements in section 1325(a). And generally, the party bearing the burden of production also

has the burden of persuasion. *E.g.*, McCormick on Evidence §§ 336–37 (2d ed. 1972). On the other hand, Rule 3020(b)(1) also provides that an objection to confirmation is governed by Rule 9014, which would make the objector the moving party. The burden of persuasion might then be placed on the objector as the party "seeking to alter the status quo, because without objection, the plan would be confirmed." *In re Mendenhall*, 54 B.R. at 46; *In re Flick*, 14 B.R. 912 (Bankr.E.D.Pa.1981). *See also* McCormick § 337, at 786.[9]

Bankruptcy courts are divided on this issue. *Compare, e.g., In re Goodavage*, 41 B.R. at 743; *In re Sellers*, 33 B.R. 854 (Bankr.D.Colo.1983) *with In re Mendenhall; In re Flick*. In *Flick*, a case decided prior to the enactment of both the current Bankruptcy Rules and the disposable income test, Judge Twardowski held that a creditor objecting to confirmation bears both the burden of production and the burden of persuasion. However, in a footnote, Judge Twardowski cited authority for the proposition that allocation of the burden of proof may depend upon the basis of the objection. 14 B.R. at 915 n. 7. As one court has stated, "[a]lthough the civil litigation guidelines for allocation of the burden of proof are helpful ... it is difficult to draw an accurate plaintiff-defendant analogy between a Chapter 13 bankruptcy confirmation proceeding and a civil proceeding." *In re Mendenhall*, 54 B.R. at 46. Therefore, it is appropriate to consider policy issues arising under section 1325(b) objections.

There is a striking difference between subsections (a) and (b) of section 1325. Section 1325(a) provides that "the court shall confirm a plan if" the six requirements set forth in subsections (1) through (6) that follow are satisfied. By comparison, the requirements of subsection (b) are not mandatory; a plan can be confirmed which does not comply with subsection (b). The requirements of this subsection apply

9. *In re Hines*, 723 F.2d 333 (3d Cir.1983) does not clearly address these issues. It seems to hold that the debtor's burden of production, if any, after objection on the issue of good faith, is met by the report of the standing chapter 13 trustee recommending confirmation.

only when an unsecured creditor files an objection to the plan; it is the objection that puts the disposable income test before the court.

Put another way, even without creditor objection, the requirements of subsection (a) are at issue; the subsection (b) standards are put in issue only by the creditor's objection. Whatever the analogy to civil litigation may be for objections under section 1325(a), in the context of section 1325(b), it is the creditor who is the moving party and who seeks to change the state of affairs.

■ More significantly, this critical distinction between subsections (a) and (b) leads me to conclude that Congress did not intend to allow creditors, by doing no more than filing an objection under section 1325(b), to prevail on an objection to confirmation. Even assuming arguendo that the debtor has the burden of proof on confirmation on section 1325(a) objections, had Congress intended to similarly place the burden on the debtor under subsection (b), it would not have permitted confirmation of plans which do not comply with subsection (b) in the absence of objection; it would simply have added the disposable income test as an additional requirement under section 1325(a)(1)–(6). Therefore, I hold that the objecting creditor has the initial burden of producing satisfactory evidence to support the contention that the debtor is not applying all of his disposable income for three years to the chapter 13 plan. *Accord, e.g., In re Flick; cf. In re Stranahan Gear Co.,* 67 B.R. 834 (Bankr.E.D.Pa. 1986) & authorities cited therein (under section 362 of the Code, which expressly allocates the burden of persuasion on the issue of "cause" to debtor, the party seeking relief from stay has the burden of production).

■ I also hold that once the creditor has met its initial burden under section 1325(b)(1), the ultimate burden of persuasion rests with the debtor. Assigning the ultimate burden of persuasion to the debtor makes policy sense. Detailed knowledge of income and expenses is peculiarly within the debtor's possession. Once a creditor has met its initial burden of going forward, it is fair to require the debtor to come forward with evidence that all disposable income is being submitted toward plan payments. *See In re Gathright,* 67 B.R. at 391. While the objecting creditor certainly has at its disposal an adequate arsenal of discovery tools to ferret out the facts, *see Bankr.Rules* 9014, 7026, 7028–37, it may often be economically infeasible for an unsecured creditor to put the necessary resources into such a case, particularly since the result may only be a modest percentage increase in the fund to be divided pro rata among all holders of unsecured claims. For these reasons, it is fair, once the creditor has met its burden of going forward, to place the ultimate burden of proof on the debtor.

■ In this case, given my narrow scope of review, PNB made an extremely risky decision in relying solely upon submission of the debtors' income and expense statements. In the absence of obvious defects in a debtor's budget, submission of the budget alone will not meet the creditor's burden of production. In this case, however, for the reasons previously discussed, I find that PNB has met its burden, if barely. It would ordinarily follow, in this case, that PNB's objection would be sustained and the confirmation denied. However, in the particular circumstances of this case,[10] I will exercise my equitable discretion to reopen the record and allow the debtors, as well as PNB should they so desire, to submit additional evidence in sup-

**10.** The debtors' counsel of record is James Gannon. I am aware that, shortly after the hearing in this case, Mr. Gannon ceased practicing law, apparently due to health problems. There is a reasonable possibility that Mr. Gannon's illness affected his representation in this case. It would be in the interest of justice to permit the debtors to obtain substitute counsel if they still desire confirmation of their proposed plan. *Cf. United States v. Cirami,* 563 F.2d 26 (3d Cir. 1977) (illness of attorney can be basis for relief from judgment under Fed.R.Civ.P. 60).

port of or against confirmation with respect to the section 1325(b)(1) objection.

An order consistent with this opinion [11] shall be entered.

11. This opinion constitutes the court's findings of fact and conclusions of law pursuant to

Bankr.Rules 9014 and 7052.