**In re Anastacio NAVARRO and Amelia M. Navarro, Debtors.**

**Bankruptcy No. 87–03022F.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 17, 1988.

Mitchell W. Miller, Miller & Miller, Philadelphia, Pa., for debtors, Anastacio Navarro and Amelia M. Navarro.

Edward J. Leonard, Philadelphia, Pa., for movant, Philadelphia Federal Credit Union.

Edward Sparkman, Philadelphia, Pa., trustee.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

This contested matter involves an unsecured creditor's objection to the debtors' chapter 13 plan on the sole ground that it does not meet the disposable income test set forth in 11 U.S.C. § 1325(b). The creditor, Philadelphia Federal Credit Union ("PFCU"), argues that because the debtors propose to continue to tithe to their church and send a child to parochial school during the period of their chapter 13 bankruptcy plan, their plan may not be confirmed because it does not commit all of the family's disposable income to payments under the

plan. Although I sympathize with the creditor's position and find the issues presented here to be difficult, I find that the applicable standard mandated by the disposable income test precludes the relief sought by the creditor.

## I.

The facts presented are not in dispute.[1] The debtors are individuals whose current income for themselves and two children is $1,148.00 monthly, earned by Anastacio Navarro, the debtor/husband as a mechanic. Amelia Navarro, the debtor/wife recently resigned from her job as a lace finisher in order to care for the debtors' disabled daughter, who otherwise would have required special child care.

The debtors propose and apparently have commenced making 60 monthly payments under their chapter 13 plan of $135.00 each. Also included in their schedule of monthly expenses are payments of $220.00 for utilities, $400.00 for food, $150.00 for medical expenses, $100.00 for recreation, $260.00 for child care, $220.00 monthly for tuition for one child at parochial school, $260.00 paid as a tithe to the debtor's church, and $85.00 for various miscellaneous expenses including clothing and laundry.

At hearing in this matter, PFCU offered the debtors' schedules and plan into evidence. Mrs. Navarro, the debtor/wife, then testified that she had recently resigned from her job, thus drastically altering the family's current income and budget. Mrs. Navarro stated that the family's reduced circumstances have resulted in elimination of expenditures for medical care (health insurance), recreation and child care.[2] Additionally, the amount of the expenditure for parochial school has been reduced to $100.00 monthly and the family's tithe has decreased to $120.00 each month. The debtors continue to propose $135.00 monthly payments to the trustee under

---

1. This opinion shall constitute the findings of fact and conclusions of law required in this contested matter by Bankr.Rules 7052 and 9014.

2. This abatement of the debtor's expenditures for medical care, recreation and child care has apparently resolved PFCU's objections to those expenses so that the only remaining objections involve the debtors' school expenses and tithe.

their bankruptcy plan for 60 months.[3] Taking into account the debtors' reduced current income and expenditures, there is virtually no cushion to be retained by the debtors over and above their expenses and plan payments.

Ms. Navarro further testified that she and her family are devout Seventh Day Adventists. She stated that she considers the obligations to tithe and provide a religious education for her son [4] as central to her personal beliefs and the tenets of her faith. Upon inquiry by her attorney, Mrs. Navarro stated straightforwardly and credibly that she considered her obligation to tithe to be indispensable so that she would find a way to continue to do so no matter how the court rules in this matter.

The creditor, PFCU, is the largest general, unsecured creditor of the estate with a claim of approximately $8,000.00. It is undisputed that if the debtors' plan is confirmed as proposed, PFCU will receive less than 3% of its claim.

## II.

11 U.S.C. § 1325(b) provides:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(b) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which

is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Because it is clear that the value of the property to be distributed under the plan to PFCU is less than the amount of PFCU's claim within the meaning of section 1325(b)(1)(A), both the creditor and the debtors correctly focus on the provisions of section 1325(b)(1)(B) and the definition of disposable income found in section 1325(b)(2)(A). PFCU argues that religious contributions and religious education are not "reasonably necessary to be expended —for the maintenance or support of the debtor or dependent of the debtor" so that the debtors are not committing all of their disposable income to the plan. The debtors respond that not only is their right to make religious contributions and provide religious education for their children constitutionally protected by the free exercise clause of the first amendment, but also that such payments are reasonable and necessary for the maintenance of the debtors and their family according to their personal ethic and beliefs.

## III.

I note at the outset that both the debtors and the creditor here have constitutional arguments based on the First Amendment. The debtors argue that their right to tithe is protected by the free exercise clause of the First Amendment and that forcing them to choose between tithing and proposing a confirmable bankruptcy plan by application of the disposable income test would deprive them of constitutionally protected substantive rights. *See In re Green,* 73

---

3. Apparently, payments in that amount are the minimum necessary to effect a cure of the debtors' default on a home mortgage under 11 U.S. C. § 1322(b)(5).

4. The fact that their disabled daughter attends public rather than parochial school is not a

reflection on the depth of the family's religious convictions, according to Mrs. Navarro, but rather a reflection of the reality that the parochial school is not equipped to handle disabled students.

B.R. 893 (Bankr.W.D.Mich.1987). Alternatively, the creditor implicitly argues that by allowing the debtor to contribute funds to a church which could otherwise be used to pay unsecured creditors, the court is indirectly compelling the creditor to support religious endeavors in violation of the establishment clause and right to freedom of association found in the First Amendment. *See In re Green. Cf. In re Curry*, 77 B.R. 969 (Bankr.S.D.Fla.1987) (the effect of allowing a chapter 13 debtor to tithe during the period of his plan "is to permit the debtor to require that *his creditors* contribute to his chosen charity") (emphasis in original).

Upon reviewing the relevant precedents, I find I need not resolve this matter on constitutional grounds. Neither the debtors' argument under the free exercise clause nor the creditor's potential arguments under the establishment clause and the freedom of association guarantee compel or preclude confirmation.

In *Hobbie v. Unemployment Appeals Commission of Florida*, — U.S. —, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), the Supreme Court for the third time in the last 25 years held that in certain circumstances a state's denial of unemployment benefits may unconstitutionally burden a applicant's right to free exercise of religion. *See also, Thomas v. Review Board of the Indiana Employment Security Div'n.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Hobbie*, the court reversed a decision to deny unemployment benefits to an individual who lost her job for refusing to work on Saturday [5] stating:

"Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, *or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs*, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."

*Hobbie*, 107 S.Ct. at 1049 *citing Thomas*, 450 U.S. at 717–718, 101 S.Ct. at 1431–1432 (emphasis added). In *Sherbert, Thomas*, and *Hobbie* the court stated that denial of a benefit because of conduct mandated by religious belief "must be subjected to strict scrutiny and could be justified only by proof by the state of a compelling interest".

The case at bench is distinguishable from *Hobbie* and its precursors because the role of the bankruptcy court under 1325(b) is not to award or deny substantive government benefits, but rather to balance the interest of various private parties according to neutral principals emanating from Congress. *See United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). I note that having insufficient income to meet one's obligations either inside or outside of bankruptcy, always results in pressure on a debtor to reorder his or her financial priorities. By allowing a creditor to enforce its rights, whether such rights involve foreclosure, bankruptcy or any other remedy, against a person who chooses to make religious contributions, a court is inevitably an instrument of pressure on the debtor to either forego the contributions or to allow the creditor to exercise its rights.[6] *Cf. United States v. Lee*, 455 U.S. at 261, 102 S.Ct. at 1057 ("... every person cannot be shielded from all burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.")

---

**5.** In *Hobbie* the plaintiff, as the debtors here, was asserting her principles as a member of the Seventh Day Adventist Church.

**6.** A debtor could not credibly argue, for example, that a court may not constitutionally enter foreclosure judgment in favor of a mortgagee, because the debtor's religious contributions make her unable to meet her obligations under the mortgage.

■ Moreover, to the extent that the availability of a bankruptcy discharge is a governmental benefit, its availability would not be precluded by an adverse decision pursuant to 11 U.S.C. § 1325(b), since the debtor could tithe from assets which are not property of the estate, *see* 11 U.S.C. §§ 541, 1306 or could file (or convert to) a case under chapter 7 of the bankruptcy code which requires no payments to creditors from income in order to receive a discharge.[7]

■ In *Green,* the court concluded that under the standard enunciated in *Hobbie,* granting the relief requested by the creditor (i.e. denial of confirmation because of the debtor's tithe) would be unconstitutional. I cannot agree. Even if I were to decide that strict scrutiny is appropriate, I would find that application of section 1325(b) here serves a compelling government interest: that being administration of the bankruptcy system and protection of the legitimate interests of creditors.

I am more persuaded, however, by the position of the court in *Green* in holding that confirmation of a plan which does not pay all unsecured creditors in full while the debtor proposes to continue religious contributions does not violate the creditor's rights under the establishment clause. *Green,* 73 B.R. at 894–95. The *Green* court analyzes the creditor's position in light of the three pronged test set forth in the Supreme Court's opinion in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and concludes that confirmation would not be inconsistent with any of the three prongs. The *Green* court states *inter alia:*

> Granted, the payment of this tithe will probably advance the work of the debtor's church. However, the payment is not a transfer of government funds to the church. Rather, the payment is a transfer of the debtor's property to her church. If these funds did not go to the church, they would go toward the debt-

ors' other living expenses or toward paying their creditors, but not to the United States. To the extent that the debtor's church is benefited, it is as a result of the private choice of the individual debtor interposed between the court and the church. Such an attenuated benefit cannot be deemed to confer the imprimatur of state approval on any particular religion or upon religion as a whole. *Mueller v. Allen,* 463 U.S. 388, 399, 103 S.Ct. 3062, 3069, 77 L.Ed.2d 721 (1983). Therefore, the court concludes that confirming this plan does not give the Bankruptcy Code a construction which has the principal or primary effect of either advancing or inhibiting religion.

*Id.* See also, *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (the independent choice of the recipient of a neutrally available government benefit to use that benefit to help pay for religious education does not violate the establishment clause).

■ For similar reasons, I find that the confirmation of the plan would not be an unconstitutional use of government power to coerce the creditor to support views which it does not endorse. *See generally, Ellis v. Brotherhood of Railway, Airline and Steamship Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Confirmation will not require the creditor to directly support the debtor's religious beliefs insofar as the creditor has no specific claim to the money which the debtor would transfer to the church.[8] *See generally, Consolidated Edison Co. v. Public Service Comm'n.,* 447 U.S. 530, 548, 100 S.Ct. 2326, 2338–39, 65 L.Ed.2d 319 (1980) (dissenting opinion of Justice Blackmun); *Galda v. Rutgers,* 772 F.2d 1060 (3rd Cir.1985) *cert. denied* 475 U.S. 1065, 106 S.Ct. 1375, 89 L.Ed.2d 602 (1986). Through tax benefits

---

7. As will be discussed below, it is probably not in the creditor's interest here to force the debtor to make such a choice.

8. If, for example, the debtors dismissed their bankruptcy, the creditor would have no particular right to garnish or otherwise execute upon the funds which the debtors seek to transfer to their church.

to churches and their contributors, our government has chosen a policy which not only directly eases the tax burden on religious institutions but also encourages individuals to make religious contributions. In doing so, the cost of operating religious institutions is spread, in part, to all tax-paying members of society, whether or not they adhere to a particular religious belief. The Supreme Court has concluded that this enforced, indirect contribution to religious institutions is not unconstitutional. *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed. 2d 697 (1970). *See also Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

In sum, I conclude that I can either confirm or refuse to confirm the debtor's plan without violating the constitution. Consequently, I must determine the appropriate inquiry under 11 U.S.C. § 1325(b) and apply it to the facts of this dispute.

### IV.

11 U.S.C. § 1325(b) represents Congress' attempt to statutorily resolve issues relating to the appropriate minimum requirements for funding a chapter 13 plan from a debtor's postpetition income. *See* 5 *Collier on Bankruptcy* ¶ 1325.08[1] at 1325–42 to 1325–46 (15 ed. 1987) ("Collier"). *See also In re Fries,* 68 B.R. 676 (Bankr.E.D.Pa. 1986). If a creditor objects to confirmation on the basis of section 1325(b) and that creditor is not to receive full payment under the plan, the plan may only be confirmed if the debtor proposes to include all of his or her projected disposable income in the plan for a three year period. For the purposes of the case *sub judice,* disposable income is defined as all income which the debtor receives "which is not reasonably necessary to be expended—for the maintenance or support of the debtor or a dependent of the debtor."

The statutory language leaves an open question about the appropriate scope of inquiry to determine when particular budgeted expenses are "reasonably necessary to be expended for the maintenance and support" of the debtor or the debtor's de-

pendents. The legislative history of section 1325(b) has been called "singularly vague and unenlightening." *In re Jones,* 55 B.R. 462 (Bankr.D.Minn.1985). In relevant part this history states:

Chapter 13 relief is essentially equitable, and contemplates a substantial effort by the debtor to pay his debts. Such an effort, by definition, may require some sacrifices by the debtor, and some alteration in prepetition consumption levels. Thus, the debtor might reasonably be required to devote to the plan that portion of his income which is not necessary for support of the debtor and his family. The courts may be expected to determine norms for such support, and Labor Department cost of living figures may provide some help. This approach will also permit plans to be confirmed where the debtor does make a substantial effort to pay his debts, even though the payment itself is not substantial.

S.Rep. No. 65, 98th Cong. 1st Sess. 22 (1983).

Recognizing that general Labor Department cost of living figures may not be particularly helpful in analyzing individual elements of a debtor's budget, courts have struggled to identify workable standards. In *Jones,* the court looked to case law under 11 U.S.C. §§ 523(a)(2)(C) and 522(d)(10)(E) for assistance. Section 523(a)(2)(C) is relevant insofar as it provides that "luxury goods or services do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor". Section 522(d)(10)(E) allows a debtor to exempt certain pension, profitsharing and other similar payments "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor". The *Jones* court applied the definition in section 523(a)(2)(C) and interpreted the case law under section 522(d)(10)(e) and concluded that

the reasonably necessary standard requires that the Court take into account other income and exempt property of the debtor, present and anticipated ... and that the appropriate amount to be set

aside for the debtor ought to be sufficient to sustain basic needs not related to [the debtor's] former status in society or the life style to which he is accustomed

. . .

*In re Jones,* 55 B.R. at 466 *citing In re Taff,* 10 B.R. 101 (Bankr.D.Conn.1981). *See also In re Kitson,* 65 B.R. 615, 622 (Bankr.E.D.N.C.1986) ("A chapter 13 debtor who proposes to pay his creditors 38 cents on the dollar cannot expect to go first class when 'coach' is available."); *In re Hedges,* 68 B.R. 18 (Bankr.E.D.Va.1986); Note, *The Disposable Income Test: An Attempt Toward Uniformity,* 4 Bankr. Dev.J. 221 (1987).

■ As I noted in an earlier opinion, *In re Fries,* 68 B.R. 676, 683 (Bankr.E.D.Pa. 1986), I believe that "the scope of my review of the debtors' living expenses is narrow". In general, 11 U.S.C. § 1325(b) should not be considered a mandate for a court to superimpose its values and substitute its judgment for those of the debtor on basic choices about appropriate maintenance and support.[9] As stated in *Collier:*

.... a court determining the debtor's disposable income is not expected to, and should not, mandate drastic changes in the debtor's lifestyle to fit some preconceived norm for chapter 13 debtors. The debtor's expenses should be scrutinized only for luxuries which are not enjoyed by an average American family. For example, since it is not unusual for families to send their children to parochial schools, a court should not deem that a luxury. However, sending a child to a private boarding school is much less common, and could be deemed a luxury if no special necessity were shown. Similarly, it is not unusual for a family to have two automobiles. But there is no necessity

that those automobiles both be the latest models or that they be in the luxury class.

In short, the court cannot and should not order debtors to alter their lifestyles where there is no obvious indulgence in luxuries, even where one or more unsecured creditors demand such a change. To engage in such close judgments and supervision would be to contravene the intent of Congress. It would also place impossible burdens on the court in determining the absolute necessity of every expense in each debtor's budget.

*Collier* ¶ 1325.08[4][b] at 1325–48 to 1325–49. *See also In re Tinneberg,* 59 B.R. 634 (Bankr.E.D.N.Y.1986); Gross, *Preserving a Fresh Start for the Individual Debtor: The Case for Narrow Construction of the Consumer Credit Amendments,* 135 U. of Pa.L.Rev. 59, 114–140 (1986).[10]

■ In *Fries,* 68 B.R. at 685, I held that the creditor has the initial burden of production on an objection to confirmation pursuant to section 1325(b). Once that burden is met, the ultimate burden of persuasion rests with the debtor. *Accord, Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1226 (8th Cir.1987); *In re Crompton,* 73 B.R. 800, 809 (Bankr.E.D. Pa.1987). In evaluating whether those burdens are met, I conclude that it is necessary to proceed on a case by case basis, evaluating in each case the totality of the circumstances. While a court should not lightly substitute its judgment for that of the debtor, section 1325(b) mandates that it do so when any one of the following factors is present:[11]

a. the debtor proposes to use income for luxury goods or services;

9. A court ought not, for example, require that a long-term resident of a suburban community move to the city where housing and other costs are less expensive simply because it will increase the disposable income which can be paid to unsecured creditors.

10. A broad interpretation of what constitutes disposable income would contravene the congressional intention of encouraging debtors to use chapter 13, especially in cases such as this one where the debtors have no assets from

which they would be required to repay creditors in a chapter 7 case. *See generally, In re Bobroff,* 766 F.2d 797, 803–04 (3rd Cir.1985). It appears that if the debtors here had filed under chapter 7, the objecting creditor would have received nothing.

11. These factors are not meant to be exclusive, but rather a guide to relevant considerations in evaluating a case under section 1325(b).

b. the debtor proposes to commit a clearly excessive amount to non-luxury goods or services;

c. the debtor proposes to retain a clearly excessive amount of income for discretionary purposes; [12]

d. the debtor proposes expenditures which would not be made but for a desire to avoid payments to unsecured creditors; [13]

e. the debtor's proposed expenditures as a whole appear to be deliberately inflated and unreasonable.

## V.

■ In the case at bench, I believe that the creditor's objection to confirmation must fail. Although not every debtor would tithe and send their child to religious school, I am not prepared to conclude that tithing and religious education are *per se* unreasonable choices for the maintenance and support of a chapter 13 debtor's family.

Our society recognizes and some might say encourages [14] religious affiliation and participation in religious activities. Many persons of various denominations believe that religious endeavors are very much a part of the activities necessary for the maintenance and support of an individual and his or her family. Here the issue, at bottom, is whether money spent on such religious activities and pursuant to sincerely held religious beliefs can be "reasonably necessary for the maintenance and support" of the debtors and their minor dependents.

I conclude preliminarily that religious contributions and parochial school education are not expenses for luxury goods or services. The debtors obtain no tangible benefit or increased standard of living because of the money expended. *Compare,*

*In re Hedges,* (boat not used in employment is "purely recreational" and hence constitutes a luxury item). Rather these expenses are incurred purely out of the debtors' conviction that they are essential for the spiritual and moral well-being of the family.

■ I recognize that, due to the costs and expense of maintaining places of worship and schools, religious participation in our society is not, in general, without cost. *Cf. Matter of Moses,* 59 B.R. 815 (Bankr.N. D.Ga.1986) (recognizing that church can give value within the meaning of 11 U.S.C. § 548 for tithes and offerings). I thus conclude that some level of religious or charitable contribution and some expenditure on religious education may be consistent with expenditures reasonably necessary for maintenance and support of chapter 13 debtors. This principle has been implicitly recognized by the Judicial Conference of the United States which promulgated the official bankruptcy forms and schedules used by chapter 13 debtors to set forth, *inter alia,* their proposed income and expenditures during their chapter 13 plan. Although I recognize that these forms do not have the force of substantive law, *see In re Curry,* I believe it is significant that Official Form 10 includes an entry for "religious and other charitable contributions."

The question then becomes how large a contribution may be reasonably necessary for the debtors' maintenance and support. Here the debtors spend $100.00 monthly on religious education for their son and $120.00 monthly on their tithe. Having determined that some expenditure for religious education may be considered reasonably necessary for maintenance and support, I conclude that $100.00 monthly is not

---

12. *See generally, Fries,* 68 B.R. at 683 n. 7; *In re Crompton,* 73 B.R. at 809.

13. For example, if a debtor proposes a new expenditure on indoor parking when in the past he has parked his automobile on the street, it would be evidence that the debtor prefers indoor parking to committing disposable income to unsecured creditors.

14. To the extent the tax code allows exemptions for religious contributions, for example, taxpayers have a incentive to make such contributions. *See generally, Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

excessive.[15] As to the debtors' religious contribution, I note that various religious denominations, at least since biblical times, have required contribution of a tithe. In the context of a sincerely held religious belief in a denomination which mandates a tithe,[16] I cannot hold that contribution of a tithe is excessive. *But see In re Curry; In re Sturgeon,* 51 B.R. 82 (Bankr.S.D.Ind. 1985). *But see also, In re Breckenridge,* 12 B.R. 159 (Bankr.S.D.Ohio 1980) (payment of tithe considered an element indicating the debtors' lack of good faith pursuant to 11 U.S.C. § 1325(a)(3)); *In re Cadogan,* 4 B.R. 598 (Bankr.W.D.La.1980) (failure to obey court order to amend plan to eliminate debtors' tithe considered as an element mandating dismissal of the case).

My resolution of this contested matter might be different if there were evidence that these debtors were making religious contributions or sending their son to parochial school as part of a conscious choice to presently favor their religious beliefs over unsecured creditors. If the evidence, for example, showed that tithing was a relatively recent decision made by the debtors it might be inferred that the religious contributions are made in contemplation of bankruptcy. However, in this matter the credible testimony of Mrs. Navarro indicates not only that tithing is a family practice of long-standing, but also that she would continue to tithe irrespective of the decision of this court even if it meant the bankruptcy would fail.

In short, I am convinced by the evidence that these debtors are committed to paying all of their disposable income into their plan. The debtor's proposed expenses taken as a whole are quite austere; they will not be living a first-class lifestyle at the expense of their creditors. I am unwilling to substitute my judgment about the relative value of religious contributions and education for what is clearly their belief that tithing and parochial school training is

necessary for the maintenance and support of their family.

Consequently, the creditor's objection to confirmation will be overruled. An appropriate order will be entered.

---

**15.** I do not conclude that expenditure on private schools may never be excessive. *See In re Jones; Collier,* 1325.08[4][b] at 1325–49.

**16.** This is not a dispute in which a debtor is making payments to a church which is the alter ego of the debtor. *See e.g. In re Zarling,* 70

B.R. 402 (Bankr.E.D.Wis.1987). *Cf. Matter of Voss,* 73 B.R. 91 (Bankr.M.D.Fla.1987) (IRS claim allowed where debtor/taxpayer impermissably deducted contributions made to congregation without tax exempt status).