In re Bonnie J. DUNN, Debtor.

Robert L. DUNN, Plaintiff,

v.

Bonnie J. DUNN, Defendant.

Bankruptcy No. 96–15111.
Adversary No. 97–1174.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Sept. 17, 1998.

Thomas H. Flessa, Batavia, OH.

James R. Garvin, Cincinnati, OH.

## DECISION

JEFFERY P. HOPKINS, Bankruptcy Judge.

We are asked to decide in this adversary proceeding whether a debt incurred under a property settlement, as incorporated into a state court divorce decree, is nondischargeable pursuant to 11 U.S.C. § 523(a)(15). The Plaintiff in the case is Robert L. Dunn, the debtor's ex-husband. (Plaintiff, Robert L. Dunn and Defendant–Debtor, Bonnie J. Dunn are hereinafter referred to as "Mr. Dunn" and "Mrs. Dunn," respectively.) Our jurisdiction over this matter rests upon 28 U.S.C. § 1334(b) and the General Order of reference entered in this District. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). What follows is the court's findings of fact and conclusions of law pursuant to Rule 7052.

### Procedural History

On October 4, 1997, Mrs. Dunn, filed a petition seeking relief under chapter 7. In a general order dated January 7, 1998, Mrs. Dunn was released from all dischargeable debts, and on January 13, 1997, the case was closed. Subsequently, Mrs. Dunn moved to reopen the case to add two creditors to the Schedules, including in particular, her ex-husband for the purpose of discharging a divorce-related debt. When Mr. Dunn objected to the case being re-opened, the Court after conducting a hearing on the matter, issued an order, on August 25, 1997, granting Mrs. Dunn's motion to amend the Schedules adding Mr. Dunn as a creditor, but also permitting him 30 days in which to file an adversary complaint objecting to discharge of the divorce obligation.[1] A Complaint challenging dischargeability of the debt and an Answer were timely filed. On June 12, 1998, a trial on the merits was conducted.

1. *See In re Walker,* 195 B.R. 187, 204–209 (Bankr.N.H.1996) (court finds legal and equitable authority for determining that it had the power to set new deadlines for filing complaints objecting to discharge of debts for fraud, wilful and malicious injury, embezzlement, or non-support divorce debts in cases where the creditor had been omitted from the schedules); *see also In re Soult,* 97 B.R. 363, 365 (S.D.Ohio 1989),

## Finding of Facts

While married in 1992, Mr. and Mrs. Dunn purchased a new Geo Storm automobile. The parties financed the Geo Storm through G.E. Evendale Employees Federal Credit Union (the "Credit Union"). The Credit Union would only acquiesce in the deal if allowed to place a second mortgage against the parties' marital residence for $15,343, or the purchase price of the automobile. When the parties' 12-year marriage was terminated on December 15, 1993, the divorce decree entered by the Clermont County Court of Domestic Relations incorporated by reference a separation agreement which they had signed on November 10, 1993. In that settlement, the parties agreed that Mrs. Dunn would take possession of the Geo Storm and hold Mr. Dunn harmless with respect to the debt. The pertinent language of the agreement incorporated into the decree provides:

b. *Motor Vehicles:*

. . .

The 1992 Chevrolet Geo Storm shall be the property of the wife. The wife shall be responsible for the debt associated with the 1992 Geo Storm and shall hold the husband harmless from the same.

. . .

Both the husband and the wife agree to execute any documents necessary to accomplish the aforementioned division of vehicles.

Instead of repaying the debt associated with the court-ordered obligation, on October 4, 1996, Mrs. Dunn filed the instant chapter 7 petition. In the bankruptcy petition, Mrs. Dunn noticed all interested parties that she was surrendering the Geo Storm to the creditor, pursuant to 11 U.S.C. § 521. Eventually, the car was repossessed by the Credit Union and presumably sold. A deficiency balance on the Geo Storm debt then arose

*aff'd* 894 F.2d 815 (6th Cir.1990) (citing *In re Daniels,* 51 B.R. 142 (Bankr.S.D.Ohio 1985) (omitted creditor given 30 days in re-opened case to file nondischargeability complaint)); *In re Brown,* 60 B.R. 983 (Bankr.S.D.Ohio 1986) (previously unscheduled creditor given a reasonable opportunity to file nondischargeability complaint).

but no one is altogether certain how much is still owed. None of the evidence adequately addressed that issue. No promissory note was ever produced, nor was there any discussion of the interest rate being charged under the note. In the Amendment to Schedule D filed after the case had been re-opened, Mrs. Dunn placed the balance due on the automobile note at $10,700. At trial, however, she lowered the value of the debt significantly to around $9,000. Mr. Dunn, on the other hand, believes based on statements received from the Credit Union that a balance of $10,500 remains. The parties do not dispute that the monthly payments on the Geo Storm had been approximately $195 before the car was repossessed.

Mrs. Dunn, a 46-year-old woman, was once employed in middle management at General Electric where she had earned an annual salary of $47,000 before electing early disability retirement in June 1992. Mrs. Dunn suffers from a severe case of rheumatoid arthritis. She has had numerous surgeries and expects to have several more intrusive surgical procedures to resolve some of the pain associated with her condition. There is no dispute that Mrs. Dunn's illness is chronic and has rendered her permanently unable to work.

Despite her unemployment and poor health, Mrs. Dunn maintains a very high standard of living. Most of Mrs. Dunn's medical expenses including physician visits, hospitalization and prescription medicine are covered under health insurance. Mrs. Dunn reluctantly admits spending only nominal amounts on co-payments, averaging around $70 for prescriptions and $30 for physician visits every month. As for income, Mrs. Dunn testified that she receives a total of $2,600 from various sources every month. Included within this sum are a pension from G.E. in the amount of $552 which is taxed income. Mrs. Dunn also receives Social Security benefits of $1,134 and disability income of $918.75 from another source, which are not

subject to taxation according to her. For reasons that were never fully explained, however, Mrs. Dunn's Schedules only reflect a monthly income of $2,458 from those same three sources, leaving a surplus of $142 over expenses.

More evidence concerning Mrs. Dunn's standard of living emerged during her cross-examination. In 1996, Mrs. Dunn began living with a companion, Joseph Kelly.[2] Kelly is employed as a building inspector for the State of Ohio where currently he earns $18.00 per hour. Based on that wage, Kelly probably earns an annual income in the vicinity of $38,480. Even though the couple is unmarried, according to their testimony they live as "husband and wife." They also share all living expenses with only one exception of note relating to the purchase of a new pick-up truck used primarily by Mrs. Dunn. Mrs. Dunn and Kelly also live in a home which was purchased for $144,750. From the testimony, it appears that the couple viewed this acquisition as a joint transaction with each expected to contribute half to the monthly mortgage payment of $1,330 on the house. In fact, Mrs. Dunn and Kelly deposit all their income into one joint checking account. Mrs. Dunn performs all the couple's bookkeeping and pays all the bills from that joint account.

On January 7, 1997, Mrs. Dunn received a discharge under Chapter 7 of personal liability on over $11,500 of unsecured debts. However, very shortly after filing for bankruptcy, Mrs. Dunn began making extravagant purchases. Mrs. Dunn purchased a new pick-up truck valued at $23,000 which by agreement with Kelly he financed but she pays for from her income alone. In the process, Mrs. Dunn traded an older model Bronco that she had owned. Mrs. Dunn does not try to hide these facts. Instead, Mrs. Dunn justifies buying the new truck on the basis that there is only an .85 cents difference in the monthly payments between the two vehicles. Mrs. Dunn failed, however, to discuss the difference in the term and interest rate on the

---

**2.** Kelly also appears to be the same individual to whom Mrs. Dunn claims to have sold a 19' boat that she had received under the divorce decree. Mrs. Dunn's Schedules reflect she sold the boat to Kelly in June 1996 for $1,000 and that there is "no relationship" between the parties. However-

er, her trial testimony put the sale amount on this boat closer to $3,000. She claims to have used those proceeds and the proceeds from the sale of a 1968 Chevelle received under the divorce decree for living expenses.

remaining payments for the new truck which would greatly increase the cost of owning that vehicle.

Mrs. Dunn and Kelly also made a number of expenditures on consumer goods and real estate improvements shortly after she filed bankruptcy for which there also appears to be no reasonable explanation. Perhaps because of Mrs. Dunn's pending bankruptcy, the couple again used Kelly's accounts to incur all these expenses. However, there was a clear understanding between Mrs. Dunn and Kelly, then and now, that her income would also be used to service the accumulating debts. For example, Mrs. Dunn and Kelly purchased all new appliances,[3] new carpeting and a new vinyl kitchen floor for their home. A new $7,000 outdoor pond was constructed on part of the six acres of property surrounding the couple's home, along with a gravel driveway costing between $1,500 and $2,000, and a new 12' × 60' deck on the rear of their home. More than $2,000 worth of shrubs and trees were also installed. In addition to these aesthetic improvements, the couple purchased a new computer for $3,100, and a new John Deere tractor costing them $350.15 a month. Mrs. Dunn and Kelly both own cellular telephones which, from the evidence presented, they were billed $282.19 during May 1998. Their home also contains two separate phone lines which cost them $122.21 in May 1998 to operate.

By contrast, Mr. Dunn maintains a rather Spartan lifestyle compared to that of his ex-spouse. Mr. Dunn currently works as a custodian at the General Electric plant where he earns an annual salary of $41,000 per year. Mr. Dunn has few debts, none of which are very large, including some personal loans, a $1,300 Visa bill and car note. Mr. Dunn also resides in the house which was once the parties' marital residence.[4] Moreover, the Credit Union continues to hold a second

mortgage on the home stemming from Mrs. Dunn's default on repayment of the debt related to the Geo Storm. At the moment, the Credit Union is taking a wait-and-see approach before attempting to collect the debt. However, the Credit Union has the option of initiating foreclosure proceedings against Mr. Dunn's residence or bringing civil action against him personally as co-signor of the note to recover the unpaid balance.

Mr. Dunn instituted this adversary action in Mrs. Dunn's bankruptcy proceeding seeking a determination that the debt associated with the Geo Storm which Mrs. Dunn was ordered to repay as part of the property settlement in the divorce case is nondischargeable pursuant to 11 U.S.C. § 523(a)(15). Mrs. Dunn claims no ability to repay the debt at this time or that the benefits to her of a discharge of the debt outweigh the detriment to Mr. Dunn if he is forced to repay the obligation. Mr. Dunn argues, however, that his former spouse could repay the divorce-related expense were she to live a less extravagant lifestyle. He also maintains that it would be economically detrimental for him to repay Mrs. Dunn's remaining obligation on the Geo Storm given his other financial responsibilities such as meeting his mortgage payment, car note and dating expenses each month.

### Discussion

■ The 1994 amendments to the Bankruptcy Code created a new section 11 U.S.C. § 523(a)(15). In effect, the amendment provides that debts incurred in divorce proceedings are generally nondischargeable in bankruptcy. *In re Patterson*, 132 F.3d 33, 1997 WL 745501 (6th Cir. Nov. 24, 1997) (other citations omitted). The majority of courts which have analyzed the terminology of § 523(a)(15) have found that this section creates a "rebuttable presumption" that the di-

---

**3.** These purchases were made even though the divorce decree evinces that Mrs. Dunn received a washer and dryer. She claims to have given one of these appliances to her mother for lack of any storage space.

**4.** Under the separation agreement, Mr. Dunn was allowed to retain possession of the parties'

former marital residence in exchange for payment of $5,000 to Mrs. Dunn. Mrs. Dunn was required to tender a quitclaim deed of her interest in the property to Mr. Dunn. Mr. Dunn owes approximately $35,000 on the first mortgage for the house.

vorce obligation is nondischargeable unless the debtor makes an appropriate showing under subsections (A) or (B) of 11 U.S.C. § 523(a)(15). *In re Carroll,* 187 B.R. 197, 200 (Bankr.S.D.Ohio 1995); *In re Patterson,* 199 B.R. 21 (Bankr.W.D.Ky.1996); *see also, In re Barnes,* 218 B.R. 409 (Bankr.S.D.Ohio 1998) (there may be a trend developing among bankruptcy courts to treat the proof required to establish grounds for dischargeability of a debt incurred in a divorce proceeding under § 523(a)(15)(A) or (B) as affirmative defenses); *In re Jodoin,* 209 B.R. 132, 139–40 (9th Cir. BAP 1997); *In re Moeder,* 220 B.R. 52, 56 (8th Cir. BAP 1998) (of the Bankruptcy Appellate Panels which have considered this question, both have concluded that § 523(a)(15)(A) and (B) must be treated as affirmative defenses); *In re Crosswhite,* 148 F.3d 879, 883 (7th Cir.1998) ("stating that bankruptcy discharge is subject to exception which must be proven by the 'one who would bring himself within the exception,' and that when there is an 'exception to the exception,' the debtor must offer evidence to show the right to the benefit.") (quoting *Hill v. Smith,* 260 U.S. 592, 594–95, 43 S.Ct. 219, 67 L.Ed. 419 (1923)).

■ Another important aspect of § 523(a)(15) is that it concerns the relative positions of the parties as of the date of the filing of bankruptcy, not as of the date of the divorce. *In re Carroll,* 187 B.R. at 200. *But see, In re Anthony,* 190 B.R. 433, 438 (Bankr. N.D.Ala.1995) (financial condition of parties at the time of trial is controlling); *In re Paneras,* 195 B.R. 395, 404–05 (Bankr. N.D.Ill.1996) (some courts look through the time of trial into the immediate future). In every case decided under § 523(a)(15), bankruptcy courts have exclusive jurisdiction to determine dischargeability. *See In re Milburn,* 218 B.R. 862 (Bankr.W.D.Ky.1998); *In re Windom,* 207 B.R. 1017 (Bankr.W.D.Tenn. 1997).

Turning our attention now to the statute in this case, 11 U.S.C. § 523(a)(15), it reads in pertinent part, as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

* * *

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging· such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

■ As discussed, no one disputes that the debt on the Geo Storm was incurred by Mrs. Dunn "in connection with a separation agreement, divorce decree, or other court order of record." § 523(a)(15). Indeed, the parties entered a stipulation on that matter prior to the beginning of trial. Evidence of that fact alone is enough to support a judgment in favor of nondischargeability of the debt unless Mrs. Dunn establishes one of the two defenses articulated under subsections (A) or (B) of 11 U.S.C. § 523(a)(15). In order for Mrs. Dunn to prevail she must prove, by a preponderance of the evidence, an inability to pay the debt pursuant to § 523(a)(15)(A), or that a discharge of the debt would result in a benefit to her that outweighs any detrimental consequences to Mr. Dunn or his dependents under § 523(a)(15)(B). *See, e.g., In re Barnes,* 218 B.R. at 411.

**A. Inability to Pay Test.**

■ A debt incurred through divorce proceedings will only be discharged under the narrow exception in § 523(a)(15)(A) if repaying it reduces the debtor's current income below that reasonably needed for the support of the debtor or dependents. *In re Carroll,* 187 B.R. at 200. Moreover, the

language of § 523(a)(15)(A) has been found to be analogous to the language of the "disposable income" test found in 11 U.S.C. § 1325(b)(2). Thus, only expenses which are "reasonably necessary" for the support of a debtor and debtor's dependents will be considered in calculating whether the debtor is unable to pay the debt arising from a divorce decree or property settlement.[5] "Courts interpreting 'reasonably necessary' have arrived at several standards. Many courts are reluctant to impose their own values on the debtor and exclude only luxury items and obvious indulgences. Other courts find that only those expenses for basic needs not related to the debtor's former status in society or accustomed lifestyle should be allowed." *In re Willey*, 198 B.R. 1007, 1014 (Bankr. S.D.Fla.1996) (quoting *In re Hill*, 184 B.R. 750, 755 (Bankr.N.D.Ill.1995)) (other citations omitted). We conclude ultimately that the debt will be deemed dischargeable only if the debtor cannot afford ordinary living expenses in addition to having to repay the divorce obligation ordered by the state court. *See In re Barnes*, 218 B.R. at 411.

■ Here, Mrs. Dunn's Schedules I and J show current monthly income and expenditures totaling $2,458, respectively. Under this scenario, Mrs. Dunn has no disposable income from which she could possibly repay the debt ordered in the divorce proceedings associated with the Geo Storm. However, the figures presented in Schedule I vary significantly from Mrs. Dunn's trial testimony where she stated a monthly income of $2,600. As noted, this results in a surplus of $142 each month over her expenses. Also listed under the Mrs. Dunn's Schedule J is an expenditure of $490 per month for "tuition

and school and living expenses for daughter." When pressed, Mrs. Dunn substantially modified that statement at trial. There, Mrs. Dunn testified that she no longer makes those tuition payments because her daughter dropped out of school. Thus, Mrs. Dunn's disposable income level actually exceeds her monthly expenses listed in Schedule J at the time of trial. Under these circumstances, Mrs. Dunn currently has excess monthly income of $632. Furthermore, Mrs. Dunn has made no effort to amend Schedule J to add expenses that may have been forgotten when the petition was filed, as sometimes occurs in these cases. Nor has Mrs. Dunn sought to include unexpected, necessary expenses that may have been incurred since the petition was filed.[6] Mrs. Dunn's only response to why there are not now any discretionary funds available is that the money has all been applied to cover other living expenses.

■ By her own admission, Mrs. Dunn currently uses all her disposable income to pay for luxury items and obvious indulgences not reasonably necessary for her support. Very shortly after filing for bankruptcy, Mrs. Dunn began irresponsibly incurring debt on extravagant expenses, albeit jointly with Kelly. The list includes a relatively expensive mortgage,[7] a new personal computer, a very expensive deck, outdoor pond, shrubs and driveway, a remodeled kitchen, a new tractor, and a new pick-up truck. All these items are unnecessary amenities.[8] By analogy, these expenditures clearly are not ones which bankruptcy courts have considered "reasonably necessary" for the support of a debtor or a dependent under 11 U.S.C. § 1325(b)(2). Accordingly, we are not inclined here to find

---

**5.** In this case, the Court need not consider the potential negative impact on the Debtor's dependents since there are none.

**6.** Though not listed in Schedule J, Mrs. Dunn claims that she spends an additional $100 on average each month to care for an adult daughter living outside her home. The Court is not persuaded by Mrs. Dunn's testimony nor is that the kind of expense which can ordinarily be classified as one for a dependent for bankruptcy purposes. *See, e.g., In re Tracey*, 66 B.R. 63 (Bankr.D.Md.1986) (in an unusual case, a 72-year-old grandmother was considered a dependent of the debtor).

**7.** A home mortgage payment may not be reasonable in some circumstances when the debtor can find adequate rental housing for significantly less money. *See In re Kitson*, 65 B.R. 615 (Bankr. E.D.N.C.1986); *In re Jones*, 55 B.R. 462 (Bankr. D.Minn.1985).

**8.** In *Reyes*, the court determined that a four-wheel drive Blazer is an extravagance. *In re Reyes*, 106 B.R. 155 (Bankr.N.D.Ill.1989). Similarly, a late model Cadillac and Corvette were held to be luxury items not "reasonably necessary" for the support of the debtor. *In re Gibson*, 142 B.R. 879, 882 (Bankr.E.D.Mo.1992).

them acceptable under a § 523(a)(15)(A) analysis.

As a general rule, "reasonably necessary" expenses as defined in chapter 13 cases means "adequate" but not "first class." Luxury items are definitely excluded from this definition. *See In re Easley*, 72 B.R. 948, 949 (Bankr.M.D.Tenn.1987) (citing *In re Kitson*, 65 B.R. 615 (Bankr.E.D.N.C.1986)); *In re Tinneberg*, 59 B.R. 634 (Bankr. E.D.N.Y.1986). Mrs. Dunn may be forced by this decision to live a less opulent lifestyle than the one she desires. However, courts have consistently held that the bankruptcy laws in this country are to give the honest but unfortunate debtor a fresh start. This time-honored principle does not guarantee that debtors should have a fine finish, as well. *See In re Jones*, 138 B.R. 536, 539 (Bankr.S.D.Ohio 1991).

We also hold serious doubt about many of the claims being asserted in Schedule J regarding Mrs. Dunn's monthly expenses. The Court need not engage in an exhaustive analysis in order to reach this conclusion. Schedule J states that Mrs. Dunn spends $450 a month for food for one individual. *See In re Reyes*, 106 B.R. 155 (Bankr.N.D.Ill. 1989) (the court held that $300 per month is too much to pay on a food bill for a single person with no dependents in refusing to confirm a chapter 13). Mrs. Dunn also lists $100 per month for clothing and $130 per month for transportation even though she lacks any need to incur costs for the daily commute to and from work, or for uniforms ·or business attire. Further, despite testifying that she owns health insurance which covers most of her medical costs except for a nominal amount of $100, Mrs. Dunn asserts

in Schedule J that she pays $250 a month on medical and dental expenses. We believe that the costs contained in Schedule J may have been purposefully inflated to make it appear as though Mrs. Dunn has no ability to satisfy any other obligation besides the ones listed. That strategy seems, however, to have backfired based upon the discovery of excess income which is now being used to pay for luxury items.

*In re Armstrong*, 205 B.R. 386 (Bankr.W.D.Tenn.1996), lists nine factors bankruptcy courts should consider when examining whether a debtor has the ability to pay an obligation incurred in a divorce proceeding sought to be discharged under § 523(a)(15)(A).[9] Of the factors listed, Mrs. Dunn seems only to receive favorable consideration under the one directed at the lack of future earning potential. However, even if Mrs. Dunn's income remains stagnant as she claims that it has for the past seven years, we conclude that she still can afford the court-ordered $195 payment. This is especially true because of Mrs. Dunn's marriage-like arrangement with Kelly. Kelly is in relatively good health and enjoys stable employment. Further, he appears willing, well into the foreseeable future, to continue sharing living expenses with Mrs. Dunn. Indeed, as illustrated, Mrs. Dunn and Kelly, for the past two years, have incurred numerous joint expenses and commingled their incomes as though they are husband and wife. Thus, we believe that it is appropriate to include Kelly's income, after deducting his personal expenses, for purposes of calculating Mrs. Dunn's ability to repay the court-ordered debt. *See In re Crosswhite*, 148 F.3d 879, 889 n. 17 (whether economic interdependence

---

**9.** Those factors are as follows: (1) debtor's "disposable income" as measured at the time of trial; (2) presence of more lucrative employment opportunities which might enable the debtor fully to satisfy his divorce-related obligation; (3) extent to which the debtor's burden of debt will be lessened in the near term; (4) extent to which the debtor previously has made a good faith effort towards satisfying the debt in question; (5) amount of the debts which a creditor is seeking to have held nondischargeable and the repayment terms and condition of those debts; (6) value and nature of any property the debtor retained after his bankruptcy filing; (7) amount of reasonable and necessary expenses which the debtor must incur for the support of the debtor, the debtor's dependents and the continuation, preservation and operation of the debtor's business, if any; (8) income of debtor's new spouse as such income should be included in the calculation of the debtor's disposable income; and (9) any evidence of probable changes in debtor's expenses. *In re Armstrong*, 205 B.R. at 392.

between a debtor and live-in companion improves the debtor's economic condition and ability to pay under § 523(a)(15)(A), is left to the sound discretion of the trial judge who should consider such factors as the period of time the individuals have lived together as a single economic unit and the degree to which they have commingled their assets); *see also In re Cleveland,* 198 B.R. 394, 399 (Bankr. N.D.Ga.1996) (considering income of a new spouse or "spousal equivalent" when applying § 523(a)(15)(A) is appropriate). *But see, In re Willey,* 198 B.R. 1007 (Bankr.S.D.Fla. 1996) (refusing to consider income of debtor's girlfriend).

Based on this record, the Court concludes that Mrs. Dunn failed to carry the burden of proving an inability to pay the divorce-related debt owed her ex-spouse from disposable income. Even without considering Kelly's income, Mrs. Dunn has excess monthly disposable income of $632 which is enough to satisfy her court-ordered obligation of $195 each month on the Credit Union loan. This result can be achieved without depriving Mrs. Dunn of adequate food, clothing shelter and other necessities. Having thus failed to satisfy the test under § 523(a)(15)(A), we next turn our attention to § 523(a)(15)(B) to see if the debt under the state property settlement agreement and divorce decree is dischargeable under the so called "balancing detriments" test.

## B. Balancing of Detriments Test.

■■■■■ Mrs. Dunn may still be able to shed her divorce-related obligation if she can prove by a preponderance of the evidence that the benefit of a discharge to her outweighs the detriment that will be suffered by

her ex-husband. 11 U.S.C. § 523(a)(15)(B). In the *Patterson* case, the Sixth Circuit voiced approval of an eleven-part test meant to examine the "totality of the circumstances" in these type of cases which was adopted in *In re Smither,* 194 B.R. 102, 111 (Bankr.W.D.Ky.1996).[10] *See In re Patterson,* 1997 WL 745501, at 3. The *Smither* court reviewed the financial status of both the debtor and the former spouse in order to ascertain the actual benefit the debtor would derive from a possible discharge of the debt against any hardship the former spouse and/or children would suffer as the result of the discharge. If, after applying the eleven *Smither* factors, the debtor's standard of living would be greater than or approximately equal to the ex-spouse's/creditor's if the debt is not discharged, then the debt should be nondischargeable under § 523(a)(15)(B). However, if the debtor's standard of living would fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged. *See In re Patterson,* 1997 WL 745501, at 3 (quoting *In re Smither,* 194 B.R. 102, 111 (Bankr.W.D.Ky.1996) (quoting *In re Owens,* 191 B.R. 669, 674–75 (Bankr.E.D.Ky.1996))); *see also Crosswhite,* 148 F.3d 879, 888 n. 16 (the court supplies an excellent synopsis of the several different versions of the "totality of circumstances" tests approved in these cases).

■■■■ Application of some of the *Smither* factors to the present case does not bode well for Mrs. Dunn. Neither the Credit Union debt of up to $10,500, nor the $195 monthly payment amount is particularly onerous for Mrs. Dunn to bear judging from her monthly income and reasonable living expenses.[11] As

---

**10.** The *Smither* court relied on the following eleven non-exclusive factors: (1) the amount of debt and payment terms; (2) all parties' and spouses' current incomes; (3) all parties' and spouses' current expenses; (4) all parties' and spouses' current assets; (5) all parties' and spouses' current liabilities; (6) parties' and spouses' health, job training, education, age, and job skills; (7) dependents and their ages and special needs; (8) changes in financial conditions since divorce; (9) amount of debt to be discharged; (10) if objecting creditor is eligible for relief under the Code; and (11) whether parties have acted in good faith in filing bankruptcy and in litigation of § 523(a)(15). *In re Smither,* 194 B.R. at 111; *see also In re Armstrong,* 205 B.R. at 392.

**11.** Even if the Court were only to focus on the late model pick-up truck Mrs. Dunn purchased, we would have to conclude that by selling that vehicle she could afford to repay the divorce-related debt.

the Court earlier noted, Mrs. Dunn's present income exceeds her monthly liabilities by $632. Nor does Mrs. Dunn have any dependents who would be affected if the debt is deemed nondischargeable. Moreover, Mrs. Dunn's lack of capacity for higher income is off set by Kelly's potential to increase his earnings through his employment with the state. We also believe that Mrs. Dunn's recent discharge of over $11,500 in unsecured debts listed on Schedule J should improve her ability to repay the debt ordered by the divorce court. It is true that Mr. Dunn admits having an ability to pay this debt from his income. However, Mrs. Dunn has not met her burden of proving that *her* standard of living will fall materially below that of her ex-spouse's if the debt is not discharged. *In re Patterson*, 1997 WL 745501, at 3; *In re Crosswhite*, 148 F.3d 879, 889.

Finally, we feel compelled to comment briefly on suggestions of bad faith found in this record. This is an important factor to be considered under *Smither*. As noted, Mrs. Dunn has engaged in a reckless pattern of spending on non-essential luxuries. We believe that the Congressional policies underlying 11 U.S.C. § 523(a)(15)(B) militate strongly against allowing debtors to escape court-ordered divorce obligations by exhausting disposable income on luxury purchases in order to claim an inability to pay an otherwise valid debt. Likewise, we do not believe a proper construction of § 523(a)(15)(B) would permit a debtor to receive a discharge of a debt owed an ex-spouse based solely upon an assertion that repayment of the obligation would cause a reduction in the debtor's standard of living below one which is suitable for the debtor's own tastes, but is equal to or—in this case—above that of the non-debtor former spouse, who lives modestly within his means. This would send debtors the wrong message and give them an unfair advantage which, in our opinion, does not outweigh the detriment to the debtor's ex-spouse. *See* § 523(a)(15)(B); *In re Crosswhite*, 148 F.3d 879, 886.

We conclude that despite having a serious permanent illness which limits her ability to pursue meaningful future employment, Mrs. Dunn has enough monthly income to satisfy appropriate living expenses while also being able to repay the obligation to Mr. Dunn incurred under the divorce decree. Mrs. Dunn enjoys a much higher standard of living than her ex-spouse does. We have little doubt that Mrs. Dunn will continue to maintain at least an equivalent standard of living to that of her ex-husband well into the future even if the debt is not discharged, especially given her quasi-marital relationship with Kelly. Under these circumstances it is clear that Mrs. Dunn can afford to make a $195 monthly payment in connection with the debt owed to her ex-husband with relative ease. "Discharging this obligation would simply provide [Mrs. Dunn] with additional disposable income to 'use at [her] discretion.' This is not the type of benefit that § 523(a)(15)(B) sought to protect." *In re Carroll*, 187 B.R. at 201.

Based on the foregoing, it is hereby

**ORDERED** that the financial obligation on the Geo Storm debt owed Mr. Dunn pursuant to the Judgment Entry and Divorce Decree entered by the Clermont County Court of Domestic Relations, Common Pleas, Division of Domestic Relations, is not discharged pursuant to 11 U.S.C. § 523(a)(15). Thus, creditors holding a valid claim against Mrs. Dunn on the Geo Storm are not enjoined against the commencement of an action to collect the debt by lawful means notwithstanding the general order of discharge already issued in this case. 11 U.S.C. §§ 524(a) and 727(a).

**IT IS SO ORDERED.**