In re David H. KITSON, SS#: 512–44–2017, Jane Louise Kitson, SS#: 015–52–9131, Debtors.

Bankruptcy No. 86–50849–ATS.

United States Bankruptcy Court, E.D. North Carolina.

Oct. 2, 1986.

William C. Lawton, Raleigh, N.C., for debtors.

Trawick H. Stubbs, Jr., Newbern, N.C., Trustee.

## MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION

A. THOMAS SMALL, Bankruptcy Judge.

The matter before the court is the confirmation of the debtors' chapter 13 plan. On August 15, 1986, the trustee, Trawick H. Stubbs, Jr., objected to the confirmation of the debtors' plan on the ground that the plan does not pay unsecured creditors in full or provide that all of the debtors'

projected disposable income will be applied to make payments under the plan for a period of three years, as required by 11 U.S.C. § 1325(b). A hearing was held in Raleigh, North Carolina, on September 2, 1986.[1]

After considering the evidence presented at the confirmation hearing and the case file, the court agrees with the trustee that the plan does not propose to pay unsecured creditors in full and that the debtors have not committed all of their disposable income to the plan for a period of three years. Consequently, confirmation of the plan must be denied.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(L), which this court may hear and determine.

## FACTS

David H. Kitson and Jane Louise Kitson filed a joint petition under chapter 13 of the Bankruptcy Code on April 8, 1986. The debtors' plan called for monthly payments of $150 for the first twelve months, $250 monthly for the next twelve months, and monthly payments of $350 for the final thirty-six months of the plan. Payments under the plan were to be distributed first to priority claimants, next to pay off the $4,069.74 arrearage on the debtors' home mortgage, with the balance going to unsecured creditors. The debtors proposed to continue making their regular home mortgage payments ($1,925.00), two car payments ($458.00), and payments on debts secured by purchase money security interests in personal property ($425.00) "outside

the plan." After the meeting of creditors, the plan was modified to provide for one monthly payment of $150, eleven monthly payments of $195, twelve monthly payments of $250, and thirty-six monthly payments of $350. According to the trustee's calculations, the holders of allowed unsecured claims would receive a dividend of thirty-eight (38%) percent.

Mr. Kitson is a software engineer, and is employed by General Electric Corporation; his annual income is more than $61,000 a year. Mrs. Kitson also works for General Electric Corporation as a computer specialist; her income is approximately $29,000 per year.

At the time of the petition, the debtors had three children—a son age 12, and two daughters ages 9 and 4. The 9 year old daughter lived with Mr. Kitson's first wife. Since the filing of the petition, Jane Kitson gave birth to another child and Mr. Kitson's son moved to Kansas to live with his mother and sister.

The Kitsons moved to Raleigh from Boston, Massachusetts, in 1984. At the time of their move, the Kitsons decided to "stretch" their budget and to purchase a large home "as an investment." The four bedroom house contained 3,200 square feet, cost $180,000 and had a mortgage of $170,000. In order to make the large mortgage payments required and to maintain their lifestyle, the debtors accumulated large credit card and charge account debts.

In addition to the house which the debtors value at $185,000, other assets listed on the debtors' schedules include:

| ASSET | VALUE | LIENS |
|---|---|---|
| 1977 Datsun 200 SX | $2,400 | $2,400 |
| 1982 Datsun Maxima | 4,500 | 2,900 |
| Furniture | 16,000 | 5,800 |
| Husband's Jewelry | 200 | |
| Wife's Jewelry | 800 | |
| Husband's clothes | 200 | |
| Wife's clothes | 350 | |
| Personal Computer | 2,400 | 1,500 |

1. The confirmation hearing was originally scheduled for August 18, 1986, but was continued at the request of the debtor. There is a letter in the file from the debtor to his attorney which explains why the continuance was requested—the original hearing date conflicted with the debtors' vacation.

Metropolitan Life Insurance Company Policy — No Value Listed
Cash on Hand — 100
Tax Refund — 1,500

The debtors claim that all of their assets are exempt under North Carolina law. Whether they are or are not exempt, the value of the proposed plan payments exceeds the net value of such assets.

The debtors' schedules show unsecured debts totalling $42,874.00. Nearly all of these debts represent credit card charges and purchases made at department stores on open account. Unsecured claims filed within the bar date total $30,263.09.

The budget set forth by the debtors in their petition reflected net monthly income of $5,811 and monthly expenses of $5,710. The monthly expenses were broken down as follows:

| ITEM | EXPENSE |
|---|---|
| Home Mortgage Payment | $1,925.00 |
| Utilities | 240.00 |
| Food | 520.00 |
| Clothing | 225.00 |
| Laundry and cleaning | 120.00 |
| Newspapers, periodicals and books | 24.00 |
| Medical and drug expenses | 34.00 |
| Insurance (auto) | 44.00 |
| Transportation | 242.00 |
| Recreation | 287.00 |
| Dues, union, professional, social, or otherwise | 50.00 |
| Taxes | 100.00 |
| Alimony, maintenance, or support payments | 230.00 |
| Christmas, birthday gifts | 67.00 |
| Home maintenance | 100.00 |
| Montessori School | 59.00 |
| Child Care | 562.00 |
| Car Payments (2 cars) | 458.00 |
| Secured Accounts (for furniture and household goods) | 423.00 |
| TOTAL | $5,710.00 |

At the confirmation hearing, Mr. Kitson presented a new budget which showed net weekly income of $1,399 or $6,062.33 per month. Mr. Kitson testified that the debtors' monthly expenses were as follows:

| ITEM | EXPENSE |
|---|---|
| Mortgage Payment | $1,677.00 |
| Child Care | 600.00 |
| Child Support | 460.00 |
| Gasoline | 115.00 |
| Telephone | 60.00 |
| Power | 160.00 |
| Water | 15.00 |
| Newspaper | 24.00 |
| Groceries | 400.00 |
| Gymnastics | 20.00 |
| Car Insurance | 60.00 |
| Health Club | 48.00 |
| Miscellaneous (Personal care, car maintenance, home maintenance, clothing and shoes, postage, medical and dental, allowances, and entertainment) | 433.00 |
| Reserve for Federal Income Taxes | 600.00 |
| Payments on Secured Debts ($176 for automobile, $282 for automobile, $60 for computer, and $232 for furniture) [2] | 750.00 |
| | $5,422.00 |

Based on these figures presented by Mr. Kitson,[3] the difference between the debtors' monthly income and their monthly expenses is $640.00 per month ($6,062−$5,422=$640.00).

There is a wide discrepancy between the expenses stated in the debtors' original budget and those reflected in Mr. Kitson's testimony at the confirmation hearing. The home mortgage is a variable interest rate loan, and as rates have declined, the mortgage payment was reduced from $1,925 to $1,677. Child support doubled from $230 to $460 to reflect the fact that Mr. Kitson's son is now living with Mr.

---

2. Mr. Kitson indicated that the $176 monthly car payments will have to be made through May of 1987. The $282 monthly payments on the Kitsons' other car will run through December of 1986, the $60 computer payments through December of 1987, and the $232 furniture payments through March of 1988.

3. The debtor's testimony was summarized in Debtors' Exhibit #1. This exhibit is somewhat confusing because at times the debtor refers to income or expenses per week, and at other times per month. In stating the debtors' income and expenses, this court has used monthly figures.

Kitson's former wife. There is no indication, however, whether the child support payments are required by court order or whether they are voluntary payments made by Mr. Kitson to his former wife.

The $600 per month tax liability, according to Mr. Kitson, arises as the result of a reduction in the amount of tax deductible interest due on the home mortgage and a reduction made by the debtors in 1985 in the amount which is withheld from their salaries for taxes. This explanation is not entirely satisfactory. Assuming that the reduction in the home mortgage payment of $248 ($1,925 — $1,677) is all attributed to a reduction in interest, the debtors' taxes (assuming a 40% tax rate) would only increase by $99.20 per month. Furthermore, any changes made in 1985 with respect to the amount withheld from the debtors' salaries should have been reflected in the original budget filed with this court on April 8, 1986.

There is another tax consideration raised by Mr. Kitson in connection with the debtors' budget. Mr. Kitson testified that he has looked into the possibility of selling his house and renting a four bedroom dwelling. According to Mr. Kitson, the rent for a four bedroom house would be approximately $1,000, or $677 less than his present mortgage payment. While a move to a rental house would reduce the debtors' housing expense from $1,667 to $1,000, Mr. Kitson contends that the loss of the tax deduction for interest on the home mortgage would substantially increase the debtors' tax liability. Assuming that all of the $1,667 mortgage payment was interest, at a 40% tax rate the Kitsons' increased tax liability would be $666.80.

After reviewing both budgets and the testimony of Mr. Kitson, the court finds that the debtors' net take home pay is $6,062.33 per month, and that the debtors' monthly expenses of $5,422 are excessive and exceed the level reasonably necessary to be expended for the maintenance or support of the debtors and their dependents. Furthermore, the court finds that the debtors' plan does not provide that all of the

debtors' projected disposable income to be received in the three year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

**DISCUSSION AND CONCLUSIONS**

■ 11 U.S.C. § 1325(b), which was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 provides:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable, income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; or

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Section 1325(b) became applicable to this case when the trustee objected to the plan's confirmation, and the fact that the plan does not propose to pay unsecured creditors in full, means that the debtors must pay *all* of their disposable income to the plan for a period of three years.

Disposable income is defined in § 1325(b)(2), but the definition is not particularly helpful. There has been considerable debate concerning the degree to which bankruptcy judges in applying

§ 1325(b)(1)(B) should make judgments that impose limits on a debtor's lifestyle.

One commentator criticizes § 1325(b) for requiring the bankruptcy court to be "the arbiter and architect" of the debtor's lifestyle. Breitowitz, *New Developments in Consumer Bankruptcies: Chapter 7 Dismissal on the Basis of "Substantial Abuse"*, 59 Am.Bankr.L.J., 327, 351 (Fall, 1985). The same article suggests that allowing bankruptcy courts to decide such things as what income is needed for reasonable maintenance and support "is disturbing on several grounds." *Id.* at 353.

First is the question of institutional competence. Does any court, or governmental body for that matter, have the ability to determine what the appropriate lifestyle is for a particular person? What a judge may regard as a luxury may in fact be regarded by the debtor as a necessity. It is one thing to determine whether expenditures are incurred in good faith (as was required under the Code); it is quite another to determine whether they are excessive or unnecessary. Should courts be making personal judgments on a lifestyle where there are no legal standards to provide guidance or instruction? How can these decisions be reviewed? Can a body of principled precedent emerge? Is not any decision of this nature inescapably based on the arbitrary predilections of the trier of fact and should we repose such decisions in courts?

Second, and somewhat related, are the disturbing moral implications in having any governmental body decide what a person "needs" for food and shelter. *Id.* at 353.

These types of decisions, however, are not new to bankruptcy judges. Every chapter 13 plan has always required a finding that the plan is feasible—i.e., that the debtor has sufficient income to make the plan payments. Section 1325(a)(6). *See, e.g., In re Severs*, 28 B.R. 61, 65 (Bankr.S. D.Ohio 1982). Furthermore, other sections of the Code require the court to make similar findings. Section 523(a)(8)(B) ob-

ligates the court to determine if the payment of a student loan would create an "undue hardship," § 727(a)(9)(B)(ii) calls for a determination of whether a debtor has put forth his "best effort" in a prior chapter 13 (or Chapter XIII) plan, and for purposes of allowing exemptions under § 522(d)(10)(D), § 522(d)(10)(E), § 522(d)(11) (B), § 522(d)(11)(C), and § 522(d)(11)(E), the court must decide the extent to which the exemption is "reasonably necessary for the support of the debtor and any dependent of the debtor." The issue is also not unfamiliar to state courts hearing divorce cases where judges routinely determine an individual's ability to pay and a dependent's need when setting the amount of alimony and support payments.

How far should the bankruptcy court go in the § 1325(b) analysis? A leading commentator suggests that

the court cannot and should not order debtors to alter their lifestyles where there is no obvious indulgence in luxuries.... To engage in such close judgments and supervision would be to contravene the intent of Congress. It would also place impossible burdens on the court in determining the absolute necessity of every expense in each debtor's budget. Since the views of judges on such value-laden issues differ significantly, such an interpretation of the amendments would contravene their purpose of restoring nationwide uniformity to chapter 13.

5 L. King, *Collier on Bankruptcy* ¶ 1325.-08, at 1325–49 (15th ed. 1986).

The court in *In re Jones*, 55 B.R. 462 (Bank.D.MN 1985), however, held that the court's inquiry should not be limited to looking for luxury goods or services. The *Jones* court noted that the legislative history to § 1325(b) indicates that the successful completion of a chapter 13 plan " 'may require some sacrifices by the debtor.' " *Id.* at 465 (quoting S.Rep. No. 65, 98th Cong., 1st Sess. 22 (1983). The court in *Jones* applied the broad "reasonably necessary" standard first used by the court in *In re*

*Taff,* 10 B.R. 101 (Bankr.D.CN 1981) in considering what pension funds should be exempt under § 522(d)(10)(E). The *Taff* court stated:

[T]he reasonably necessary standard requires that the court take into account other income and exempt property of the debtor, present and anticipated, ... and that the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs not related to [the debtor's] former status in society or the lifestyle to which he is accustomed....

*In re Taff,* 10 B.R. at 107.

In the *Jones* case the court denied confirmation based on § 1325(b) because the debtor's monthly expenditures exceeded the *Taff* standards. Specific items identified by the court as being excessive included a $500 per month payment for college tuition, a $500 per month payment for private secondary school tuition, a $515 per month expenditure for food for a family of four, and a monthly house payment of $989. *Jones* at 467.

This court in effect used the *Taff* standard in the case of *In re Festner,* 54 B.R. 532 (Bankr.E.D.N.C.1985), where it denied confirmation based on § 1325(b) because of excessive expenses in the debtor's budget —$25 per week for a voluntary retirement benefit, a weekly deduction of $22 to purchase IBM stock, and an $85 per month payment to satisfy a loan used to purchase, and which was secured by, IBM stock. Those items were not luxuries, but they also were not necessary for support.

These expenditures are desirable from the debtor's standpoint, but they are certainly not necessary. Additional pension plans and stock purchases may be a wise investment which enhance an individual's financial security, but the debtor is not entitled to acquire them at the expense of unpaid creditors.

*Id.* at 533.

Cases interpreting 11 U.S.C. § 707(b), which, like § 1325(b), was added by the Bankruptcy Amendments and Federal Judgeship Act of 1984, are also helpful in determining the scope of the bankruptcy court's inquiry under § 1325(b).

Section 707(b) provides:

After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

This section has been interpreted to mean that a case is a substantial abuse of chapter 7 if the debtor has the ability to repay a substantial part of his debts without undue hardship. *In re Grant,* 51 B.R. 385 (Bankr.N.D.OH 1985); *In re Bryant,* 47 B.R. 21 (Bankr.W.D.N.C.1984); *In re Bell,* 56 B.R. 637 (Bankr.E.D.Mich.1986); and *In re Hudson,* 56 B.R. 415 (Bankr.N.D.OH 1985).

If a debtor has the ability to repay all or a substantial portion of his debts within a reasonable time, while at the same time maintaining a reasonable standard of living, then he cannot be so financially destitute that his immediate welfare is in question. In the absence of such jeopardy, it is morally and legally unconscionable that a person should be able to extinguish his obligations without first making a reasonable effort to fulfill them. Since the availability of Chapter 7 presupposes that a debtor has made a reasonable effort to pay his debts, it would be a substantial abuse of that Chapter to allow a debtor to discharge those debts without first making a legitimate effort at repayment.

*Hudson,* 56 B.R. at 419.

In the *Bryant* case the court stated:

While Congress intended to give the Debtors relief in [Chapter 7] cases, it was not the design of the Bankruptcy laws to allow the Debtor to lead the life

of Riley while his creditors suffer on his behalf.

*Bryant,* 47 B.R. at 26.

In the *Grant* case, after a thorough analysis of the legislative history to § 707(b), the court concluded:

> [T]he chapter 7 liquidation provisions were designed to give the truly needy a fresh start, not to give those who can afford to meet their obligations a head start.... The court will not permit these overextended debtors to use this court as an "escape hatch" when in the long run they can well afford to meet their obligations to a substantial degree.

*Grant,* 51 B.R. at 394.

In the *Grant* case, however, Judge White recognized the burden that § 707(b) placed on a bankruptcy judge.

> This bankruptcy judge does not take lightly the burden imposed upon the Court by 11 U.S.C. § 707(b) as said duties would dictate the Court impose a standard of living upon the debtors which could cause unforeseen hardships especially with the lack of guidance in the broad power given to the Court.

*Id.* at 396–97.

This court shares Judge White's hesitancy about deciding how individuals should live their lives. Judge Abram expressed the same concern in *In re Edwards,* 50 B.R. 933, 940 n. 9 (Bankr.S.D.N.Y.1985) when she stated:

> [I]t may be questioned whether church contributions of $100 a month should come ahead of repayment to creditors. Having a fourth child may be a questionable luxury. At what point such inquiries and decisions by a bankruptcy court would become an affront to society's sensibilities or the U.S. Constitution remains uncertain.

Nevertheless, these judgments must be made and in making them the court must "be guided by the Court's sense of equity." *In re Bell,* 56 B.R. 637, 641 (Bankr.E.D. Mich.1986).

■ In the present case whether the debtors have committed all of their disposa-

ble income is not at all a close question. Even if all of the debtors' claimed expenses are accurate and "reasonably necessary", their projected monthly income still exceeds their estimated monthly expenses by $640 ($6,062 − $5,422 = $640). Yet the debtors' plan calls for an average monthly payment into the plan of only $264 for the first three years of the plan. Thus, according to their own figures, the debtors' plan fails to commit $376 of extra income each month for the first three years of the plan. Although some cushion for unexpected expenses is permissible, 5 L. King, *Collier on Bankruptcy* ¶ 1325.08, at 1325–49 (15th ed. 1986), a $376 monthly cushion is excessive, especially since the debtors' claim of $433 monthly "miscellaneous" expenses should be more than adequate to take care of reasonably necessary expenses which arise unexpectedly.

■ In addition, many of the Kitsons' claimed expenses exceed that which is reasonably necessary for their maintenance and support. The Kitsons argue that selling their current residence and moving into rental housing would not increase their disposable income because the reduction in housing expenses would be offset by an increase in taxes due to the loss of the deduction for the mortgage interest payments. This argument is premised on the assumption that the Kitsons could not find adequate rental housing for themselves and their two children currently living with them for less than $1,000 a month. Another court recently found that a monthly house payment of $989 was "well above the amount necessary to provide adequate housing for a family of four." *In re Jones,* 55 B.R. at 467 (1985). Similarly, this court is of the opinion that the Kitsons could find adequate rental housing for significantly less than $1,000 a month. (A move to a dwelling which is smaller than the 3,200–square-foot home in which the Kitsons currently reside would also reduce their utility expenses.) The Kitsons claim expenses for child care of $600 a month. While it is possible to pay this much for child care for two children, this court is of the opinion

that many reputable day care facilities could be found which would charge much less. Other monthly expenses claimed by the Kitsons also appear as if they could be trimmed or eliminated, among them $48 for health club membership, $20 for gymnastics class, $24 for newspapers, books, and periodicals, and $433 for miscellaneous expenses (personal care, car and home maintenance, clothing and shoes, postage, medical and dental, allowances, and entertainment). A chapter 13 debtor who proposes to pay his creditors 38 cents on the dollar cannot expect to "go first class" when "coach" is available.

Furthermore, some of the debtors' claimed expenses will be significantly reduced during the course of the plan. A $750 monthly expense is claimed for payments on secured debts which will be made outside of the plan. However, the debtors' records indicate that many of those debts will be paid off during the first year of the plan. By June of 1987, the debtors' monthly payments for the secured debts outside of the plan will have been reduced from $750 to $292. All of their secured debts should be paid off by April of 1988. Finally, as noted previously, the Kitsons have not presented convincing evidence to show that the $600 the Kitsons propose to hold in reserve for Federal income taxes each month will actually be needed to pay taxes.

The evidence is clear that the debtors' proposed chapter 13 plan fails to commit all of their disposable income to the plan. Since the trustee has objected to confirmation of the plan, this court must deny confirmation pursuant to 11 U.S.C. § 1325(b). The debtors will be free to submit a revised chapter 13 plan which satisfies 11 U.S.C. § 1325(b). This court calculates that it would take $40,037.73 for the Kitsons to pay in full the creditors within the plan and to pay costs of administration of 13% of the total payout.[4] This could be accomplished in three years with monthly payments of $1,112.16 or in four years with monthly

payments of $834.12. Based on the evidence before it, this court would be reluctant to approve any plan in this case which did not provide that creditors would be paid 100 cents on the dollar. Furthermore, this court would not likely approve a plan which called for payments in excess of four years. Accordingly,

IT IS HEREBY ORDERED that the objection to confirmation filed by the trustee, Trawick H. Stubbs, Jr., is ALLOWED, and confirmation of the debtors' proposed plan is DENIED without prejudice to the debtors' right to submit a revised plan.

---

4. The $40,037.73 total was arrived at by adding the following figures: $500 (attorney's fee) plus $4,069.74 (arrearage on the debtors' home mortgage) plus $30,263.09 (unsecured claims filed within the bar date) plus $5,204.90 (13% of the total of $40,037.73 for costs of administration).