**In re Robert Duthie WALSH and Phebe Jane Walsh, Debtors.**

**No. 02–01407–5–ATS.**

United States Bankruptcy Court,
E.D. North Carolina,
Raleigh Division.

Dec. 20, 2002.

Travis Sasser, Cary, NC, for Debtors.

Anna B. Osterhout, Wilson, NC, for Bankruptcy Administrator.

### ORDER ALLOWING MOTION TO DISMISS CHAPTER 7 CASE

A. THOMAS SMALL, Bankruptcy Judge.

Pending before the court is the bankruptcy administrator's motion under 11 U.S.C. § 707(b) to dismiss the debtors' chapter 7 case. The debtors filed a response, and a hearing was held in Raleigh, North Carolina on December 12, 2002. For the reasons that follow, the motion will be allowed.

Robert Duthie Walsh and Phebe Jane Walsh filed a petition for relief under chapter 7 of the Bankruptcy Code on May 1, 2002. The Walshes are married, and until the time they filed their petition under chapter 7, they lived with their three teenage sons on Promontory Point in the Prestonwood Subdivision in Cary, North Carolina. Both Mr. and Mrs. Walsh are employed by SAS Institute in Cary, where their combined annual salaries aggregate approximately $120,000. Mr. Walsh has worked for SAS for thirteen years; Mrs. Walsh has worked there for nine years.

The debtors' schedules indicate that the Walshes have a number of expenses that are, according to the bankruptcy administrator, expenditures of disposable income that should more appropriately be dedicated to the repayment of debt under a chapter 13 plan. The Walshes' children, ages 16, 13, and 12, all attend Cary Academy, which is a private school. After tuition grants from the Academy, the Walshes' tuition payments total about $1,750 per month, or approximately $17,500 for the academic year. Mrs. Walsh testified that the debtors chose to send their children to Cary Academy to benefit from the improved services that it offers to the two older sons, who suffer from attention deficit disorder. They did not consider public school for their youngest son.

The debtors also listed $600 per month for recreation and clubs, which includes $240 per month for membership fees at Prestonwood Country Club, $68 per month for piano lessons, and, for about eight months of the year, $300 per month for hockey fees. Mrs. Walsh testified that the piano lessons are important to her second son, and that the oldest and youngest boys participate in a traveling hockey team because it allows them to play at a level appropriate to their advanced skills. She indicated that her oldest son has been playing for over ten years, and in her opinion is a likely candidate for a college scholarship based on his achievement in the sport. Participation in this "elite" hockey team necessitates travel which, according to the parties' stipulation during the hearing, costs approximately $150 to $250 per month during hockey season in addition to the $400 monthly amount already listed for transportation in the

Walshes' Schedule J. The debtors also list expenses of $850 per month for food, and now pay approximately $1,800 per month in rent for a 4–bedroom, 2600 square foot home that they are leasing with an option to buy.

They are, in addition, and with the likely exception of this month, repaying a $20,000 loan obtained in 2000 from Mr. Walsh's parents at the rate of $500 per month. Mrs. Walsh testified that the loan from the senior Mr. and Mrs. Walsh is the only unsecured loan that the Walshes have been paying since filing their chapter 7 petition. The Walshes purchased a 2002 Ford Taurus Station Wagon on April 12, 2002, and are continuing to make payments on that car.

Mrs. Walsh's testimony suggested that the bulk of their financial problems can be traced to the bankruptcy of the builder they retained to construct their home in Prestonwood. The builder's bankruptcy occurred prior to completion of the home and required the Walshes, who already had agreed to do some of the work themselves, to personally incur substantial additional expenses. Added to that is a high interest rate of about 10% on the first mortgage, and their inability to refinance the house.

In April of 2001, the Walshes obtained a $54,192 one-year loan from Central Carolina Bank in hopes that it would allow them to pay off other loans and improve the likelihood of obtaining refinancing. It did not do so, and, instead, their inability to make the balloon payment on the loan when it came due on April 16, 2002, exacerbated their financial problems and led to their bankruptcy filing. According to the bankruptcy administrator, the debtors have secured claims against them in the amount of $427,071, and unsecured consumer debts in the amount of $52,046. Their net monthly income is $7,782.90.

Based on the financial information outlined above, and on additional details addressed during the hearing, the bankruptcy administrator contends that the case was filed under chapter 7 in bad faith. She requests that the court dismiss the case under 11 U.S.C. § 707(b) for substantial abuse, or alternatively for cause under § 707(a). The bankruptcy administrator argues that many of the debtors' expenses, and in particular the monthly expenses for tuition, country club membership, hockey and attendant travel expenses, cable and Internet services, food ($850), and a conversion van with a TV/VCR/DVD video system ($450), are excessive and are not commensurate with the debtors' incomes. The debtors also are making $500 monthly payments to Mr. Walsh's parents, while not making payments on debts to other creditors.

If the debtors were to curtail these expenses, she argues, they could fund a chapter 13 plan. Instead, because the debtors are for the most part maintaining their lifestyle and expenses at a level proven to be excessive and seeking to discharge debts they otherwise could pay, she contends that this chapter 7 filing constitutes substantial abuse.

The debtors respond that they have substantially modified their expenses and financial position by surrendering their house, which most recently was valued between $375,000 to $385,000, and that requiring the debtors to undergo further changes to their lifestyle—and in particular to cause them to withdraw their children from an academic environment to which they are accustomed and in which they excel—is beyond what is required of a chapter 7 debtor.

The court acknowledges that the Walshes have made a significant sacrifice in giving up their home, and that their

actions appear to be in large part motivated by a sincere desire to provide for their children the education and developmental activities that they consider best. The Bankruptcy Code provides a presumption in favor of granting the relief requested by the debtor. 11 U.S.C. § 707(b). However, the court may dismiss chapter 7 cases filed by a debtor whose debts are primarily consumer debts if it concludes that granting the requested relief "would be a substantial abuse of the provisions of this chapter." *Id.* The court agrees with the bankruptcy administrator that absent truly extraordinary circumstances, a couple with steady jobs who together earn $120,000 per year, and who are able to pay expenses for private schools, hockey, travel, and country club dues, and also to repay a loan from relatives, ought to be able to make payments to creditors.

A "primary factor in determining substantial abuse is the debtor's future income and the debtor's ability to pay debts." *In re Dominguez,* 166 B.R. 66, 68 (Bankr.E.D.N.C.1994). Also relevant is the debtor's ability to trim expenses to facilitate payments to creditors. *Id.* at 69; *see also In re Kitson,* 65 B.R. 615, 620–22 (Bankr.E.D.N.C.1986) (discussing, in a chapter 13 case, the court's review of excessive expenditures and debtors' responsibilities to make reasonable efforts to pay debts).

The court also is guided by the decision of the Court of Appeals for the Fourth Circuit in *In re Green,* 934 F.2d 568 (4th Cir.1991). The *Green* decision outlined the elements of the applicable "totality of the circumstances" test applied by courts when making a determination of whether substantial abuse exists. These factors include the following:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*Id.* at 572.

With respect to the debtors' current expenditures, the private school costs are not essential. The general perception in this community is that there are very good public schools available in Cary, North Carolina, and the debtors have offered no evidence to the contrary. Regarding the hockey and associated travel expenditures, the court acknowledges that every parent wants to encourage a child's interests and, for the debtors' eldest son, to nurture apparent athletic talent that could even facilitate a scholarship down the road. However, those preferences and hopes for the future simply cannot take precedence over the debtors' other financial obligations. As for the country club membership, the court understands that the debtors are reluctant to give up a membership that they obtained on very advantageous terms and to forego activities that their family enjoys, such as golf. Still, the court cannot in good conscience approve expenditures of this nature to the detriment of creditors. (The court also notes that the debtors' employer, SAS, is widely known for having an excellent facility, including a health and fitness center and other recreational opportunities that would probably provide a good substitute for any country club.)

Aside from those observations, the court declines to specifically address every sin-

gle expenditure challenged by the bankruptcy administrator, such as the debtors' recent move to a large house that rents for $1,800 per month or monthly costs for piano lessons. It suffices to say that the debtors must reevaluate their spending priorities and significantly curtail their expenditures in light of their obligation and ability to repay their creditors.

█ The court does not want to make lifestyle decisions for debtors. In this instance, however, it would be patently unfair for the debtors to continue to make lifestyle choices that ignore their obligations to creditors. Chapter 7 bankruptcy is " 'designed to give the truly needy a fresh start, not to give those who can afford to meet their obligations a head start.' " *Kitson*, 65 B.R. at 621 (quoting *In re Grant*, 51 B.R. 385, 394 (Bankr. N.D.Ohio 1985)).

The court concludes that the debtors do have the means to repay creditors and do not satisfy the criteria to be chapter 7 debtors. The debtors together earn a substantial income and have the ability to repay debts. The debts that precipitated this filing are primarily consumer debts. The case was not prompted by any "sudden" detrimental event, and the debtors' proposed family budget is excessive in several key respects. After considering the totality of the circumstances, and particularly in light of the aforementioned factors, the court concludes that this chapter 7 case should be dismissed. Accordingly, this chapter 7 case is **DISMISSED** pursuant to § 707(b). This order shall be effective ten days after entry.

**SO ORDERED.**