**In re Amassa Courtney FAUNTLEROY, Debtor.**

**No. 03–02554–5–ATS.**

United States Bankruptcy Court, E.D. North Carolina, Raleigh Division.

June 14, 2004.

Michael Ryan Dyson, Raleigh, NC, for Debtor.

Anna Osterhout, Raleigh, NC, for Bankruptcy Administrator.

## MEMORANDUM OPINION AND ORDER ALLOWING MOTION TO DISMISS

A. THOMAS SMALL, Bankruptcy Judge.

A hearing to consider the motion of the bankruptcy administrator to dismiss the chapter 7 case of the debtor, Amassa Courtney Fauntleroy, pursuant to 11 U.S.C. §§ 707(a) and (b) was held in Raleigh, North Carolina on May 25, 2004. For the reasons that follow, the motion will be allowed under § 707(b), and the case will be dismissed.

The debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on July 16, 2003. The bankruptcy administrator filed her initial motion to dismiss on October 10, 2003, and requested dismissal under 11 U.S.C. § 707(b) for substantial abuse of chapter 7. She filed an amended motion to dismiss on May 10, 2004, seeking, in addition, to dismiss the case for cause under § 707(a).

In general terms, the basis for the bankruptcy administrator's motion is that the debtor could recoup approximately $500 of his monthly expenses if he stopped repaying a loan from his own retirement account, and that the debtor could modify his expenses in order to repay a significant portion of his unsecured debt. The bankruptcy administrator argues that the totality of the circumstances, and in particular the fact that the debtor seeks to discharge all unsecured debt despite his ability to fund a chapter 13 plan, indicate that this chapter 7 case is a substantial abuse of chapter 7 and was not filed in good faith.

The facts are outlined in more detail below. In summary, however, the court observes at the outset that this debtor is atypical. Dr. Fauntleroy is a professor of mathematics. He holds advanced degrees from prestigious universities and teaches at another, and earns $94,300 a year. His wife, also a professor, earns an annual salary of $88,418 and owns the home in which they live. The debtor generally has been enjoying an extremely comfortable lifestyle for many years. The debtor takes home most of his paycheck in cash because he claims, as he has for many years, ten exemptions. He then pays the inevitable tax bills and other bills, such as for his 2002 Acura TL automobile and the 1994 BMW automobile that preceded it, with credit cards. Accordingly, over the years the debtor has amassed approximately

$63,357 in credit card debt. He also owes approximately $11,550 in back taxes for 2002 and 2003 and anticipates that he may be responsible for approximately $61,500 in student loans that enabled his oldest child to attend Duke University as an undergraduate and law student. The debtor's financial difficulties appear to be due to a deeply entrenched lack of financial discipline that brought the debtor to this juncture and carries on through the present day in the expenditures he reports in his schedules. The court will dismiss his case as a substantial abuse of chapter 7.

## FACTS

The debtor, Amassa Courtney Fauntleroy, lives in Durham, North Carolina. Dr. Fauntleroy received undergraduate degrees from Johns Hopkins University and Northwestern University, and in 1970 earned a doctorate in mathematics from Northwestern University. He is a professor of mathematics at North Carolina State University, where he has been employed with tenure since 1986. His current salary is approximately $94,300. His wife, Lillie Searles, is not a debtor in this case and owns their home, which has a tax value of $233,543. Ms. Searles is an associate professor of biology at the University of North Carolina at Chapel Hill and her annual salary is $88,418.

The debtor has three children from a previous marriage, ages 30, 25 and 19. His youngest child is a sophomore in college, and he also has two stepchildren from Ms. Searles' previous marriage, ages 19 and 13. Ms. Searles' oldest child is also a sophomore in college, and her youngest child is the only child living with the debtor and Ms. Searles.

Together, the debtor states, he and Ms. Searles earn approximately $11,668 per month, and have expenses of approximately $11,587, for a net monthly income after expenses of $81. The debtor's Amended Schedule I states that his net monthly take home pay is approximately $6,549, including interest and his optional summer school salary and after a mandatory monthly deduction of $472 for contributions to his retirement account. The debtor's retirement account with TIAA CREF, through North Carolina State University, has a balance in excess of $400,000. In addition, the debtor pays $501 monthly to TIAA CREF to repay an approximate $25,000 loan made to the debtor from his retirement account in 2001. The debtor's responses to interrogatories and a pro forma amended Schedule I form[1] indicate that Ms. Searles has a net monthly income of about $5,119, after a $362 retirement deduction. Ms. Searles' account with the North Carolina State Employees Retirement Fund has a balance of approximately $213,000. Ms. Searles budgets an additional $73 per month in savings.

The debtor's pro forma amended Schedule I and the financial disclosures made by his wife specify the debtor's and Ms. Searles' separate contributions to the family's shared monthly expenses, but the court finds it more useful to describe them together, as a family budget. Both the debtor and Ms. Searles contribute $750 monthly toward the $1,450 mortgage, and this encumbers the marital residence owned by Ms. Searles. Together, they anticipate monthly costs of $255 for elec-

---

**1.** Although not required to do so, the debtor submitted pro forma amended Schedule I and J forms showing both his monthly expenditures and monthly expenditures for his non-filing spouse. These disclosures were attached to his memorandum in response to the motion to dismiss and were in addition to the information provided in the interrogatory responses.

tricity and heating and $205 for telephone costs. They pay $182 monthly for cable and internet services. They pay about $225 monthly for home maintenance, and budget $1,420 for food for the two of them and the 13–year–old daughter.[2]

The debtor and Ms. Searles spend approximately $205 on "transportation" costs each month, exclusive of car payments, which are $577 for the debtor and $541 for Ms. Searles. Recreation, clubs and entertainment costs are budgeted at $300 monthly. Ms. Searles anticipates monthly charitable contributions of approximately $321, and the debtor's monthly charitable contributions are $150. Ms. Searles reserves $73 monthly for savings, and budgets about $898 monthly toward her older daughter's annual college costs. The debtor allocates $600 monthly for his youngest child's sophomore college tuition and car insurance (out of an annual $7,400 cost), and another $100 monthly for "additional dependents not living at home." The debtor's schedule lists a $200 monthly payment to Circuit City, although it is apparent from his interrogatory responses that in all likelihood no more than $300 is owing.

The debtor also lists $400 monthly for 2002 taxes, $500 monthly to repay a loan from his retirement account, and an additional $1,370 per month for estimated state and federal taxes for 2003. Together the debtor and Ms. Searles budget $100 a month toward the care of the family dog. (Further, the debtor's responses to interrogatories indicate that Ms. Searles was "100%" responsible not only for the $1,000 cost of the dog, which the court assumes from its listing in Ms. Searles' expenses was a recent purchase, but also for $466 in

neutering bills, $250 in pet supplies, and $350 in annual vet bills.)

## DISCUSSION

Section 707(b) of the Bankruptcy Code provides in part:

> After notice and a hearing, the court … may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor ….

11 U.S.C. § 707(b). The debtor concedes and the court finds as a fact that the debtor's debts are primarily consumer debts. The court also finds that the granting of relief under chapter 7 would be a substantial abuse of the chapter and concludes that the case should be dismissed. Accordingly, the court need not address the bankruptcy administrator's motion under § 707(a), which provides that the court may dismiss a case under chapter 7 "for cause."

█ The Code does not define "substantial abuse," but the meaning of the term is developed through case law. In this circuit, the court follows the precedent established by the Fourth Circuit in *In re Green*, 934 F.2d 568 (4th Cir.1991). In *Green*, the court considered whether the fact that a debtor had income in excess of his necessary expenses was enough, in itself, to support dismissal of his case as a substantial abuse of chapter 7. The court concluded that the debtor's excess income was a primary factor to be considered in assessing whether the debtor's case constituted "substantial abuse" within the mean-

---

**2.** The debtor testified that the $1,420 figure included some items other than food, such as landscape materials and dining at restaurants. However, these other items were also accounted for by separate line items, so the explanation and schedules remain inconsistent at this point.

ing of § 707(b), but that it was not itself sufficient to support the finding. Instead, the court was persuaded that a substantial-abuse determination should be made based upon analysis of the totality of the circumstances of the debtor's case. *Green,* 934 F.2d at 572–73 (citing numerous cases adopting the totality of the circumstances analysis).

■ To that end, the court specified five factors that should be considered, and cautioned that the analysis should be made in light of § 707(b)'s statutory presumption in favor of granting the debtor's requested relief. The "totality of the circumstances" analysis requires consideration of these factors:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*Green,* 934 F.2d at 572.

■ The court concluded that exploration of these factors, "as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." *Green,* 934 at 572. With these directives in mind, and in light of the case analyses recommended by the *Green* court (*In re Grant,* 51 B.R. 385 (Bankr.N.D.Ohio 1985); *In re Peluso,* 72 B.R. 732 (Bankr. N.D.N.Y.1987); and *In re Shands,* 63 B.R. 121 (Bankr.E.D.Mich.1985)), the court turns to the circumstances of the case before it.

■ The first factor listed by the *Green* court requires the court to determine whether the petition was filed due to a sudden illness, disability, unemployment, or other calamity. In this case, the debtor is a tenured professor of mathematics and has been employed by North Carolina State University for over seventeen years. According to the debtor, his filing was precipitated by a series of bad financial decisions that began in the late 1980s. At that time he was receiving large tax refunds due to a deductible mortgage interest payment, so he changed the number of exemptions on his taxes from five to ten. He subsequently separated from his first wife in 1992 and lost his mortgage deduction, but he did not change the number of exemptions because he needed the money for cash flow. As a result, each year he owes from $12,000 to $13,000 to the federal government and from $2,000 to $2,500 to the State of North Carolina.

The debtor stated in his interrogatory responses that his financial crisis was precipitated by the divorce in 1992. He reports that he paid child support of over $18,000 per year for approximately five years to ensure that his three children maintained their standard of living, and that he then began to suffer from health problems, including heart problems and prostate cancer. Fortunately, his health has improved and by all appearances he is a healthy 60–year–old. In 1996 he reached a property settlement with his ex-wife that resulted in his receipt of $20,000. He used the funds to purchase a 1995 BMW 740 for $44,000. The car proved to be extremely costly to maintain, as well as to pay for, and he frequently put the ex-

penses on credit cards. The remainder of the proceeds were used to pay taxes and living expenses. In October of 2001 he traded in the BMW for a 2002 Acura TL with a purchase price of $32,690. He explained that he financed the Acura at 110% of the purchase price because the value of the BMW he traded in had dropped to $6,000 less than what he still owed. The debtor observes that through these maneuvers, he managed to both "create and dodge the financial bullet for so long." He reports that he wants to "make sure that his new spouse [is not] burdened by his past debt history." In light of this background, the court finds that the petition was not precipitated by a sudden calamity of any kind.

The second factor is whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay. The debtor contends that he made no large consumer purchases or cash advances within a year of his bankruptcy filing other than the a purchase of a television and related equipment and a video camera from Circuit City. Those purchases are worth approximately $570, according to the debtor, and are secured for $868. Although the last statement he received from Circuit City prior to the bankruptcy petition showed a balance of approximately $800, he stated in his responses to interrogatories that he owed approximately $200 for the TV and approximately $100 for the video camera.

The debtor contends, therefore, that there is no evidence of a recent "run-up" of consumer debt by the debtor prior to his bankruptcy. The court agrees. There has been, instead, a steady march of increasing credit card debt for various and sundry reasons, which may or may not include purchases of personal property. (The debtor stated that the records of his credit card purchases were not available.) According to the debtor, he kept his exemptions high to maximize cash flow, and then used the credit cards to pay taxes and other expenses. So, on that point, the court will accept that the debtor did not intentionally run up his credit card debt to purchase new luxury goods.

■ The third factor requires examination of the debtor's family budget. The specific expenditures are discussed above, and will not be repeated here. The court exercises caution in making decisions that judge, either explicitly or subtly, the highly personal choices all individuals make about how to prioritize their expenses and, on a more basic level, how to live their lives. It defies common sense to assume that the two are not related. Difficulties aside, however, "these judgments must be made and in making them the court must 'be guided by the Court's sense of equity.'" *In re Kitson,* 65 B.R. 615, 621 (Bankr.E.D.N.C.1986) (quoting *In re Bell,* 56 B.R. 637, 641 (Bankr.E.D.Mich.1986)).

■ The court looks first to the debtor's $500 monthly allocation to repay his retirement account, which was questioned by the bankruptcy administrator. This court has long held that expenditures for retirement planning are not luxuries that a debtor ought to automatically trim from a tightened budget, but also may not qualify as "necessary" expenses. In *In re Festner,* 54 B.R. 532, 533 (Bankr.E.D.N.C.1985), this court denied confirmation of a chapter 13 plan because of excessive expenses in a debtor's budget, including $25 monthly for a voluntary retirement benefit, a weekly $22 deduction to purchase IBM stock, and an $85 monthly payment to satisfy a loan used to purchase, and secured by, IBM stock. The court observed that "pension plans and stock purchases may be a wise investment which enhance an individual's financial security, but the debtor is not

entitled to acquire them at the expense of unpaid creditors." 54 B.R. at 533.

In this case, the debtor's repayment of the retirement account loan essentially repays himself while not paying his general unsecured debts. The bankruptcy administrator correctly observes that it is reasonable to want to preserve retirement savings and to avoid tax consequences, but entirely unfair to do so to the detriment of creditors. The Court of Appeals for the Sixth Circuit recently addressed this issue in *In re Behlke,* 358 F.3d 429 (6th Cir. 2004). In *Behlke,* the court held that voluntary contributions to a 401K or other retirement plan should be considered disposable income, just as a debtor's repayment of loans made from an ERISA-qualified profit sharing account should be treated as disposable income. *Behlke,* 358 F.3d at 435 (citing *In re Harshbarger,* 66 F.3d 775, 777–78 (6th Cir.1995)) (repayment of loans to a retirement account was prudent but unfair to creditors receiving less than a 100% dividend). In this case, the bankruptcy administrator reports that the debtor is required by the State of North Carolina to contribute 6% of his income to a retirement account.[3] Accordingly, the debtor's retirement fund will continue to grow even with a suspension of his repayment of the loan to himself. In light of *Festner,* as well as *Behlke* and the long line of cases in support of it, the court finds that the debtor's expenditures for voluntary repayment of the loan from his retirement account should be considered disposable income.

As to the Circuit City debt, the court agrees with the bankruptcy administrator

that the balance due should be· fully satisfied in the near future, and represents at least another $200 that can be re-allocated. And as to the remainder of the current monthly expenditures outlined on the Schedule J forms, the court has little difficulty in finding that as a whole the proposed family budget is both excessive and unreasonable. A monthly allocation of $1,420 for food for three people, in addition to $300 in recreation and entertainment for three people, is excessive. Allocation of $182 monthly for cable and internet likewise is unreasonable. Ms. Searles alone allocated $966 for Christmas gifts, according to the debtor's interrogatory responses.

The court refrains from comment on the family's election to spend a total of $471 monthly for charitable expenses to the extent that those contributions are to entities or organizations within the meaning of 11 U.S.C. §§ 548(d)(3) and (d)(4), but notes that if they are not, then these large contributions seem ill-advised. 11 U.S.C. § 707(b). The court also fully appreciates that pets often are treated like family members, but notes that this family chose to purchase an extremely expensive pet that, much like the debtor's expensive BMW, turned out to have very high maintenance costs and presumably was the catalyst for the $2,500 backyard fence. If so, then the cost and upkeep of the family dog alone totals at least $5,166 for the dog's first year. ($1000 purchase cost + $350 in vet bills, $466 for neutering, and $250 in "supplies" per the interrogatory responses' list of Ms. Searles expenses + $600 per the debtor's $50 monthly Schedule J allo-

---

**3.** The court is not able to independently verify this requirement with the documents before it, but will accept the debtor's and bankruptcy administrator's assertion that the debtor's particular retirement plan with North Carolina State University and TIAA–CREF requires this 6% contribution. Although the court suspects that the debtor's age and various income and investment options available to him through TIAA–CREF might give him current access to those retirement funds, for present purposes the court will assume that the debtor is unable to access his retirement funds without adverse tax consequences.

cation + $2,500 for fencing.) The court perceives a continuing pattern.

The debtor's responses to interrogatories recalculate some amounts by estimating about $1,000 monthly for food, $400 monthly for entertainment, $250 a month in "misc." expenses such as garden and yard maintenance, and $145 a month for savings (aside from retirement accounts). The totals are simply excessively high. It would be hard to spend these amounts on a monthly basis without trying, consistently, to purchase the best of the best, without regard to thrift. This mindset precipitated the debtor's current financial situation, and his budget shows that he anticipates carrying on as usual, but without the aggravation of accumulated debt. The proposed family budget is excessive and unreasonable, and weighs strongly in the court's mind toward a finding of substantial abuse.

The fourth category is somewhat related, in that it again emphasizes the schedules and statement of current income and expenses, and requires assessment of whether the information in them reasonably and accurately reflects the debtor's true financial condition. In sum, the debtor's true financial condition is that he accumulated tax debt by preferring to receive cash in his paycheck rather than having it withheld, and then used credit cards to float the inevitable tax payments as well as other sizeable debts, most notably for the car. Because he could not pay off the credit cards, interest escalated. The significance of his Schedule J monthly allocations of $400 for 2002 tax payments and $1,370 for estimated tax payments for 2003 is difficult to ascertain. The court cannot determine whether the $400 is intended to repay the bank whose credit card was used to pay the taxes, or is instead officially slotted to be paid to a governmental entity, or if the debtor simply means to "save" it

until taxes are due, instead of having it deducted along the way as is generally done. In sum, the court cannot find that the schedules and statements accurately reflect the debtor's true financial condition. That finding is not based on any conclusion that the debtor has withheld information, or provided information that is inaccurate; rather, it reflects the court's belief that the debtor himself has no solid understanding of where his money has been going, or where it should go in the future.

Finally, the court turns to the fifth factor, which is whether the chapter 7 petition was filed in good faith. The bankruptcy administrator contends that it was not, because the debtor seeks to discharge all unsecured debt even though he has the ability to make monthly payments to fund a chapter 13 plan. The debtor responds that the debtor's "fault" in accumulating the debt should not weigh towards dismissal of a chapter 7 case on grounds that the debt could be repaid, but rather that dismissal is more properly predicated on a debtor's ability to pay his debts out of future income. The debtor contends that dismissal of the chapter 7 is of "little benefit unless the future income of the debtor is sufficient to repay a substantial portion of creditor claims."

The court agrees that questions of fault and culpability in getting oneself into financial difficulty frequently have little relevance to the more important question of what to do, today. Relief in bankruptcy is the promise of a fresh start. Not an easy, off scot-free start, but a fresh one. To allow this debtor to avoid unsecured debt without making any effort to repay it, despite his considerable means and exceedingly comfortable lifestyle, would be unconscionable. It would be tantamount to approving the debtor's actions over the years, and it would allow the debtor to carry on as usual in the future. The oper-

ative principle in chapter 7 is that chapter 7 bankruptcy is " 'designed to give the truly needy a fresh start, not to give those who can afford to meet their obligations a head start.' " *In re Walsh,* 287 B.R. 154, 158 (Bankr.E.D.N.C.2002) (quoting *Grant,* 51 B.R. at 394).

All along, this debtor has allocated his substantial funds in the ways that were most comfortable or satisfying to him, without regard to the existence of his obligations in the form of debts that came due. The debtor's budget illustrates with absolute clarity that he either cannot envision or refuses to consider any path other than to just keep on enjoying his preferred lifestyle on a day-to-day basis, with an ingrained (and, for many years, accurate) belief that tomorrow's accounting will simply never come. The court finds this attitude indefensible.

Even if the debtor were to repay only a small percentage of what he owes, and even if the amount of extra income that could be used to fund a chapter 13 plan ultimately proved to be very small (which would surprise the court), the fact is that debtors in chapter 13 frequently live so close to the line that every penny counts: Every penny that they keep, and every penny that they put toward their plan. Many of this court's chapter 13 debtors have very limited incomes or such draining expenses (for chronic health problems, for example) that every choice is difficult and has a repercussion of some kind. Yet, still, they economize and find a way to incrementally pay back their creditors.

The debtor appears to argue that because he is earning and spending so much, and owes so much, the disparity between those big numbers and the very small amount he allows that he conceivably could repay (he cites a combined net disposable income of $81 per month) makes doing so simply not worth the effort. Even if he

allocated the amount now spent on repayment to his retirement account or the Circuit City account (which is, again, only about $300 remaining due), he says, the general unsecured creditors would be paid only 7% of their claims.

The bankruptcy administrator's math is slightly different. She argues that if the debtor paid $500 per month into a three-year chapter 13 plan instead of toward repaying the loan to himself, he could repay unsecured and priority creditors a dividend of approximately 13%. If the plan extended over five years, he could repay a dividend of approximately 22%. Moreover, those calculations include the $61,445 the debtor states that he owes, or may owe, to Sallie Mae for his oldest son's education. If this contingent claim is backed out, then the debtor's reallocation of just the $500 per month would result in a dividend to unsecured creditors of 29% over three years, or 48% over five years.

If the debtor were to propose a more reasonable family budget, the court has no doubt that he could repay even more of his debt. Other significant savings opportunities will come to pass: The debtor's youngest child is now a sophomore in college, so the $600 monthly he now allocates toward her education and insurance expenses will be available in two years, after the four years of college provided for in the debtor's separation agreement have been completed.

This court does not like to make judgments about how much someone should spend on groceries or housing, and takes no enjoyment in making the decisions for debtors and, inevitably, their families. It is the court's strong preference that debtors electing to file under chapter 7 or chapter 13 consider these questions themselves, and that they use their best efforts, and act in good faith, to consider their ability to reorganize their finances and

repay their debts. In this case, the court finds that the debtor has sufficient future income and sufficient room to economize to fund a successful chapter 13 plan. The debtor's only excuse for not paying his debts is unwillingness to alter his lifestyle. These factors are so clearly evident that the court finds the debtor's chapter 7 case was not filed in good faith.

## CONCLUSION

In assessing the totality of the circumstances as outlined above, the court remains mindful of the Fourth Circuit's emphasis on § 707(b)'s presumption in favor of granting the requested relief. However, based on a totality of the circumstances, the court finds that this chapter 7 case constitutes a substantial abuse of chapter 7, and concludes therefore that it should be dismissed under 11 U.S.C. § 707(b). Accordingly, this case is **DISMISSED.**

To the debtor's credit, he is willing to acknowledge openly that his financial difficulties are wholly of his own making. Despite his excellent education and his immersion in a field that, more than most, features an emphasis on the black and white clarity of numbers, the debtor has turned a blind eye over the years to financial problems that were not going to go away without changes in the behavior that created them. The debtor concedes that.

More than candor, however, is required to correct the problems and, specifically, to alleviate the debt. The court is confident that the debtor can propose a workable chapter 13 plan, and this dismissal is without prejudice to the debtor's right to file a new petition under chapter 13 of the Bankruptcy Code.

**SO ORDERED.**